**GENERAL MOTORS CORPORATION, a Delaware Corporation, and Union Park Pontiac, Inc., a Delaware Corporation, Defendants below, Appellants,**

**v.**

**Joseph P. DILLON, Plaintiff below, Appellee.**

Supreme Court of Delaware.

Submitted May 25, 1976.

Decided Nov. 3, 1976.

Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, for defendants below, appellants.

Edmund D. Lyons, of Morris, James, Hitchens & Williams, Wilmington, for plaintiff below, appellee.

Before CAREY, Justice Ad Litem, MARVEL, Chancellor, and BROWN, Vice Chancellor.

BROWN, Vice Chancellor.

This is an appeal by General Motors Corporation and Union Park Pontiac, Inc. (hereafter "appellants") from a jury verdict against them and in favor of the appellee, Joseph P. Dillon (hereafter "Dillon") in the amount of $65,000. The action sought recovery for personal injuries to Dillon based on charges of negligence and breach of warranty by the defendants in selling him an allegedly defective motor vehicle, which, in turn, caused the accident in which Dillon suffered his injuries. Appellants contend that the trial court erred in refusing to grant a directed verdict in their favor on the issue of liability and also erred in refusing to grant either a judgment notwithstanding the verdict or, in the alternative, a new trial.

Specifically, appellants argue that it was error to allow the matter to go to the jury based on an instruction as to the doctrine of *res ipsa loquitur*. Secondly, it is contended that even if *res ipsa loquitur* were applicable, it creates only an inference of negligence which was conclusively rebutted by the unrefuted expert testimony offered by appellants as to certain physical facts, and that for this reason also the case should have been taken from the jury.

In summary, Dillon's testimony revealed that during March 1967, he ordered a new 1967 Pontiac Firebird convertible from the appellant Union Park Pontiac, Inc. Among other things the vehicle was equipped with an "energy absorbing steering column," which was so designed that in the event of a crash the column would shear away from the dashboard and compress in order to absorb the force and energy of the driver striking it and thus reduce the degree of injury to the driver. The new car was delivered to Dillon on April 12, 1967 and was driven about Wilmington on a few limited occasions through April 14. On Saturday, April 15, Dillon drove to Long Island, New York to visit his mother and brother. At no time through April 15 did he experience any difficulty with or notice any looseness or other abnormality in the steering mechanism.

On Sunday morning, April 16, Dillon left the home of his brother to drive a few blocks to his mother's house to have breakfast with her before going to church. As he turned a corner and headed up a residential street at a speed which he estimated to be at no more than 15 miles per hour, the accident suddenly occurred. In his testimony Dillon described it as follows:

"A. I went approximately past the first two houses, and I was at the third house when I thought I heard a sound that sounded like my cigarette lighter popping out, and the whole steering column seemed to shift and I went with it. I went to grab it and I didn't know what to do. I didn't know what was happening, and the next thing I knew the car made a 90-degree turn into these two parked cars. I woke up with my head in the window.

"Q. You say the column shifted. How did the column shift? In what direction did it shift?

"A. It seemed to like just pop back and then toward the left.

"Q. It came back towards you and then to the left?

"A. Popped up and then to the left. It made a movement toward me, and then shifted over to the left.

"Q. Did it get out of your hands when it did this?

"A. No, sir. I don't believe it did."

Although repeated and embellished in varying degree on further examination, this basically constitutes Dillon's evidence as to the accident and its causation. There were no other witnesses to the event.

In opposition, appellants offered the expert testimony of Dr. Edward A. Moffatt, possessor of a Ph.D. in mechanical engineering and biomechanics, who at the time, was a Senior Analysis Engineer with General Motors charged with analyzing automobile accidents. While Dr. Moffatt had not personally inspected Dillon's vehicle, he did examine the steering column and offered an in-depth explanation of the operational characteristics of the energy absorbing steering column with which Dillon's car was equipped.

He explained that the steering column was designed to collapse upon impact only, which would require a pressure of 1400 pounds—far more than could be exerted by a human being. The column was held in place against the dash panel by plastic-filled "shear capsules" designed so that the bracket holding the steering column could break away and slide free from its moorings when a driver struck the steering wheel with sufficient force. A mesh design at the bottom of the steering column would then compress so as to cause the steering column to give with the force exerted against it. After an impact the steering wheel and column, by design, would be free and lying in the lap of the driver. In short, Dr. Moffatt testified that after Dillon's accident the fact that the steering column was loose and lying upon Dillon indicated that it had performed exactly as designed. He further stated that

there was no possible way that the steering column could "pop back" or move in the direction of a driver as Dillon had testified. The condition of the bracket, bolts, shear-capsules, etc., on Dillon's vehicle after the accident were said to be consistent with the steering column having disengaged from the dash only as designed.

In addition, Dr. Moffatt offered his expert opinion that based on the force with which the two parked cars were struck by Dillon's vehicle (one wheel of each was forced up and over a curb of some six inches in height) and the damage which was done to them, Dillon was most likely going at a speed of some 30 miles per hour at the time of impact rather than the 15 miles per hour he estimated.

Appellants point to what they charge to be numerous inconsistencies in Dillon's testimony. For example, they refer to various instances in his testimony wherein Dillon stated that upon becoming aware of the "pop" he "grabbed" for the steering wheel, while other times he stated that he already had the wheel in his hands. He also referred to the steering column as "shifting" or "jumping out or up." A doctor to whom Dillon went for treatment upon his return to Wilmington noted in his medical history that the accident occurred while Dillon was reaching for the vehicle's cigarette lighter in order to light a cigarette, a statement which, appellants urge, could only have been obtained by the doctor from Dillon himself. And the accident actually occurred six houses up the block rather than three.

By and large, however, the inconsistencies which appellants attribute to Dillon derive from the testimony of appellants' expert that it was impossible for the accident to have occurred in the manner which Dillon described and that of necessity his speed must have been greater than he admitted. Undoubtedly all of these arguments were ably presented to the jury—which obviously rejected them in favor of the testimony of Dillon which it found to be credible despite the alleged inconsisten-

cies. Thus, the first question is whether, under the doctrine of *res ipsa loquitur*, there was sufficient evidence before the trial court to allow the matter to go to the jury.

The view representing the clear weight of modern authority is that the doctrine of *res ipsa loquitur*, rather than creating a presumption of negligence, permits, but does not require, the trier of the facts to draw an inference of negligence from the proof of the injury and the surrounding circumstances. *Speiser, Res Ipsa Loquitur* (1972 Ed.) § 3:4. This is the view followed in Delaware. The application of the doctrine has flexibility which depends upon the court's evaluation of the particular situation, and a determination thereon is made at the close of the plaintiff's evidence. *Delaware Coach Co. v. Reynolds,* Del.Supr., 6 Terry 226, 71 A.2d 69 (1950).

While negligence is never presumed from the mere fact of an injury, if the particular manner in which the plaintiff shows the injury to have occurred is so unaccountable that the only fair inference of the cause was the negligence of the defendant, or, stated another way, if the manner in which the injury occurred would lead reasonable persons to conclude that it would not have happened in the absence of some negligence on the part of the defendant, then the doctrine of *res ipsa loquitur* is properly applicable to establish the negligence of the defendant. *Skipper v. Royal Crown Bottling Company of Wilmington,* Del.Supr., 192 A.2d 910 (1963); *Ciociola v. Delaware Coca-Cola Bottling Company,* Del.Supr., 3 Storey 477, 172 A. 2d 252 (1961); *Delaware Coach Co. v. Reynolds, supra.*

In discussing the procedural ramifications of the inference view of the doctrine, it is stated as follows at *Speiser, Res Ipsa Loquitur, supra,* at page 108:

"In the ordinary res ipsa loquitur case, however, even though the defendant offers evidence tending to meet and explain the circumstances, the trial court may not properly direct a verdict for defendant, but must submit the case to the jury. The inference created by the application of the doctrine of res ipsa loquitur is not necessarily overthrown by the explanation offered by the defendant. Although the defendant offers proof that he has exercised all reasonable care, the jury may still conclude that on the basis of ordinary human experience he has not. In other words, the inference of negligence raised by the res ipsa loquitur doctrine does not take flight on the presentation of rebutting evidence, even strong rebutting evidence . . .."

Where, however, the circumstances of the injury are as consistent with the absence of negligence as with its existence, then neither conclusion can be said to have been established by legitimate proof, and no issue is made for submission to the jury. *Skipper v. Royal Crown Bottling Company of Wilmington, supra.*

Applying these principles to the present case, we conclude that the trial court committed no error in submitting the matter to the jury and allowing its verdict to stand. Dillon's evidence indicated that shortly after he turned a corner and proceeded up a residential street at a relatively slow speed at about 8:00 a. m. on a Sunday morning, and with no other traffic around, he sensed a "popping" noise, the steering wheel seemed to move in his grasp, the car veered 90 degrees to the left and, as he learned upon coming to his senses after the impact, struck two parked cars on the far side of the street. He had no recollection of having shifted his foot from the accelerator to the brake. We feel that this sudden sequence of events occurring in the operation of a new automobile delivered only four days earlier is sufficient to lead reasonable persons to conclude that the injury to Dillon would not have occurred had there not been some operational defect in the vehicle and thus

negligence on the part of the appellants. The inference thus created by Dillon's evidence does not seem consistent with any other reasonable explanation and consequently it was sufficient to call for rebuttal from appellants. As such, application of the doctrine of *res ipsa loquitur* by the trial court was not improper when measured by the factors of this particular situation.

The remaining question, therefore, is whether the rebuttal evidence offered by appellants was so clear and convincing as to either totally dispel the inference of negligence thus created or at least show that the circumstances of the injury were equally consistent with a lack of negligence on their part. Compare *Delaware Coach Co. v. Reynolds, supra.* We feel that it was not.

Appellants rely primarily upon three cases which have espoused the so-called "physical facts rule." *McDonald v. Ford Motor Co.,* 42 Ohio St.2d 8, 326 N.E.2d 252 (1975); *Zollman v. Symington Wayne Corp.,* 7th Cir., 438 F.2d 28, *cert. denied,* 404 U.S. 827, 92 S.Ct. 59, 30 L.Ed.2d 55 (1971); *Lovas v. General Motors Corp.,* 6th Cir., 212 F.2d 805 (1954). The statement of this rule, as adopted by *McDonald,* is that the testimony of witnesses which is positively contradicted by the established physical facts is of no probative value and a jury will not be permitted to rest a verdict thereon. Appellants suggest that this rule was recognized in this jurisdiction when it was stated as follows in *Delaware Coach Co. v. Reynolds, supra,* at 71 A.2d 76:

> "Moreover, plaintiff's testimony was not so improbable or contrary to physical laws that the trial court was under a duty to refuse to permit the jury to evaluate it."

In *Zollman* the plaintiff was injured when an auto fell from a hoist. He testified that he had properly positioned the vehicle on the hoist. The defendants con-

ducted various tests which proved that the vehicle could not have fallen from the hoist if properly positioned. It was held that the physical facts established by the tests rendered the plaintiff's testimony to be of no probative value thus requiring a directed verdict for the defendants.

In *Lovas* the plaintiff charged that her husband had been killed in an accident caused by the steering wheel in the truck he was driving becoming disengaged from the steering shaft. The defendant's experts offered testimony to show that after the accident the locking nut was still attached to the steering wheel and the threads on the steering column were stripped, thus indicating that the wheel had been ripped loose by the force of the impact. A directed verdict for the defendant was affirmed, again on the theory that the physical facts positively contradicted the plaintiff's version of causation.

In *McDonald,* the facts were strikingly similar to those of this case. There two brothers were injured when the new vehicle in which they were riding left the road and struck a tree. The car was equipped with an energy absorbing steering device. Both brothers testified that the steering column broke loose immediately before the vehicle ran off the road. The defendant offered four expert witnesses who testified collectively that the steering column could only break loose upon the application of extraordinary force and that from an examination of the mechanism after the accident all signs pointed to the steering column having broken loose upon impact rather than before it. A directed verdict for the defendant was affirmed, the Ohio Supreme Court stating as follows at 326 N.E.2d 256–257:

> "The case, then, is starkly presented: On one side is the testimony of both appellees that something went wrong; on the other side is a theory that the mounting performed as it was intended. The former provides no explanation of the physical manner in which the falling

away of the steering column could have occurred, and requires the assumption of events which are either contradicted by the physical evidence or for which there is no evidence at all; the latter provides an explanation of all the physical facts of the case, consistent with the proper and intended functioning of the mountings. It may be that some explanation other than Ford Motor Company's is possible but any such explanation would have to be based upon physical evidence which is wholly speculative. We find that appellees have failed to meet their burden of proof, and that reasonable minds could not differ, given the evidence submitted in this case, on the issue of the existence of a defect in the mounting of the steering column."

Despite the seeming parallel of these cases to the circumstances of the present matter, we resist the temptation to apply them. We do so because the essence of the physical facts rule urged by the appellants is that the physical evidence relied upon be so clear as to bar any other explanation. We think that factors exist which negate the existence of unchallenged physical facts here.

Here, while Dr. Moffatt examined the steering column (it had been kept by Dillon in his apartment until the date of trial) he had never inspected the vehicle itself. In fact, the only inspection of the vehicle was performed some three weeks after the accident by an independent automobile damage appraiser who admittedly had no experience at the time with energy absorbing steering columns. This appraiser was not called by the appellants even though portions of his deposition were offered by Dillon. Moreover, unlike the *McDonald* case where plaintiffs unequivocally testified that the steering column broke loose before the accident, Dillon's testimony did not go that far. Rather he described the sensation in terms of the steering column "popping up," "making a movement toward him" and "seeming to shift to the left."

Unlike the plaintiffs in *McDonald, Zollman* and *Lovas,* he did not attribute the accident to a specific, identifiable defect; thus his reliance on the doctrine of *res ipsa loquitur.* So analyzed, the testimony of Dr. Moffatt was not to the effect that from the total of the physical evidence the accident could not have happened as Dillon testified. Rather, his testimony went to refute one readily apparent possible cause, namely, that the collapse and breaking loose of the steering column had taken place before impact and had thus precipitated the accident.

To summarize, Dillon offered testimony to show that suddenly something went wrong with the steering column or steering mechanism, although he knew not what. Appellants responded with expert testimony to show that based on the inspection of the steering column by Dr. Moffatt, his consideration of the earlier findings of the independent appraiser, and the design of the column itself, it was impossible for the steering column to have sheared off in any direction other than forward, and then only upon impact.

This testimony by the appellants is strong indeed. However, in our opinion, it does not rise to the level of undisputed physical facts which completely belie the likelihood of a malfunction in the steering mechanism. To hold otherwise would, in the words of the dissent in *McDonald,* constitute an "impermissible invasion of the province of the jury." As there stated by Justice Celebrezze at 326 N.E.2d 259:

"Especially in a products liability case, if we allow what is, in effect expert testimony, to conclusively determine whether or not a defect *could have existed,* we allow that evidence to determine the precise ultimate fact in issue."

(Emphasis added.)

On the facts of this matter, as argued to us, we cannot conclude that the Trial Court committed error in submitting the case to the jury and permitting its verdict to stand. Affirmed.