Marion Power Shovel Co. v. Harold Huntsman

5-4749                                              437 S.W. 2d 784

Opinion Delivered February 17, 1969

[Rehearing denied March 24, 1969.]

*Bennett & Purtle* for appellant.

*Lightle & Tedder* for appellee.

Lyle Brown, Justice.    Marion Power Shovel Co. was the plaintiff in the trial court.    Harold Huntsman, appellee and cross-appellant, was the defendant and counterclaimant below.    Marion sued for parts supplied to Huntsman which were used to repair a power shovel with a dragline attachment.    Huntsman countered with a complaint for breach of warranty concerning the original construction equipment, it having been manufactured by Marion.    Huntsman obtained judgment (the trial court sitting as a jury) under his counterclaim and

Marion appeals. Huntsman cross-appeals, alleging insufficiency of damages. The numerous points on appeal will subsequently be enumerated and discussed.

Harold Huntsman, a large-scale farmer in the Bald Knob area, was interested in purchasing a machine and attachments to be used in ditching and draining 1000 acres of lowland preparatory to cultivation. The land had previously been cleared by the use of a cutting blade attached to a tractor, by means of which trees were cut level with the ground. Huntsman contacted T. F. Shamel, who operated Standard Equipment and Supply Co. in North Little Rock. Shamel handled Marion Power Shovel products. According to Huntsman, Shamel subsequently brought to Bald Knob the district representative of Marion Power Shovel Co., one R. A. Strickland; Huntsman and Strickland made a complete tour of the acreage to be developed; details of the proposed improvements were explained to Strickland; and Strickland compiled the specifications for the type of equipment needed to put the land in shape.

There are three written instruments in the record pertaining to the sale. The first is a purchase order from Standard Equipment to Marion Power Shovel Co., itemizing the components of the machine and directing shipment to Huntsman. Marion then sent to Standard Equipment an invoice sheet. A few days later, Standard invoiced Huntsman and Huntsman paid Marion in full for the equipment. It is noted that none of those three instruments made any mention of warranty. The equipment arrived in April and Marion sent a man to perform the assembling necessary to compose an operating machine. Along with the machine there was a booklet entitled Operation and Maintenance Manual. Seven subjects are treated on page one of section 1, among which is this statement of warranty:

STANDARD WARRANTY. Marion Power Shovel Company guarantees the parts manufac-

tured by it to be free from defects in material and workmanship under normal use and service, its obligation under this warranty being limited to making good at its factory any part or parts thereof manufactured by it which shall, within six (6) months after delivery of said machine to the original purchaser, be returned to it with transportation charges prepaid, and which its examination shall disclose to its satisfaction to have been thus defective; this warranty being expressly in lieu of all other warranties expressed or implied, and of all other obligations or liabilities on Marion Power Shovel Company's part.

Huntsman further testified that he put the machines to work immediately in order to plant a soybean crop in that year. He claimed that breakdowns immediately set in; that the swing clutches would become hot and crystalize; then the ground drive chains began breaking; that next came trouble with the transmission which in two months caused the breakage of four drive shafts; and that fifteen working days were lost because the machine's rotating shaft broke. Those breakdowns, asserted Huntsman, made it impossible to plant a crop that year, and resulted in consequential damages of $25,-000. That figure was based on an estimated land rental value of $25 per acre. Huntsman also sought to recover the difference between the cost of the machine and its actual market value, that difference being in his estimation in the neighborhood of $40,000.

Marion Power Shovel produced two principal witnesses. R. A. Strickland denied having gone to the Huntsman farm prior to the sale. Conversely, he contended he met Huntsman at the office of Standard Equipment in North Little Rock, that they inspected specification sheets for various machines; that Strickland was not informed of the details of the proposed operation, other than the fact that Huntsman wanted to drain some land and build some levees; and that

Huntsman decided for himself on the final specifications. Huntsman ordered an eighty-foot boom when, according to Strickland, the standard would have been a boom of forty feet for the particular machine. Strickland conceded that the machine was not designed to operate on an eighty-foot boom with a dragline carrying a bucket of one and one-half yards capacity. Another witness was an engineer from the factory. He had inspected the broken parts which were returned to the factory and he had watched the machine operate on the ground. He concluded that the breakdowns were due to overloading and otherwise abusing the machine in operation and maintenance.

We have not attempted to relate all the voluminous evidence in the case. Much of it is not pertinent to our decision. Other evidence which requires comment will be treated in the discussion of the points for reversal.

1.  *There Is No Privity of Contract Between Marion Power Shovel and Harold Huntsman.* That is Marion's first point for reversal.

It is appellant's theory that Huntsman purchased the equipment from Standard Equipment & Supply Company and not from Marion Power Shovel. Marion further asserts Huntsman cannot claim the benefit of Ark. Stat. Ann. § 85-2-318.1 (Supp. 1967) because Marion's suit was filed prior to the effective date of that Act. Section 85-2-318.1 eliminates the defense of lack of privity under certain conditions. In examining the overall negotiations, we agree with the trial court's conclusion that the transaction was actually between Huntsman and Marion Power Shovel. In view of that conclusion, § 85-2-318.1 is not controlling.

Standard Equipment played a minimal part in the entire proceedings. Huntsman did first contact Standard and told their Mr. Shamel of his interest in purchasing equipment for draining his property. According to

Huntsman, Shamel thereafter brought Marion's Mr. Strickland to Bald Knob. Shamel had business elsewhere in the area, according to Huntsman, and left Huntsman and Strickland alone to work out the project. Strickland concedes that he made out the specifications which were transposed on Standard's order blank. Huntsman testified that Strickland authored the specifications on the latter's judgment after a tour of the farm. The check for $40,000, being the balance of the purchase price after trade-in, was apparently made to Marion Power Shovel. The equipment was shipped direct from the factory in Marion, Ohio, to Huntsman in Bald Knob. Marion Power Shovel sent to Bald Knob a Mr. Revis to oversee the assembly of the machine.

It has been held that in the case of a suit between the manufacturer and the consumer the question of whether there is privity of contract is a question of fact. See *Hewitt-Robins* v. *Lea County*, 371 P. 2d 795 (N.M. 1962), where the court held such under a similar fact situation. *U.S. Pipe* v. *City of Waco*, 108 S.W. 2d 432 (Tex. 1937), says that the court will look through the form to the substance of such a situation. In the *Waco* case, the manufacturer made certain representations as to the quality of certain pipe, inducing the city to specify such pipe in a contract with a general contractor. "By indirection it [the manufacturer] thus secured for itself a sale as certainly, and presumably as profitably, as if a direct contract of sale had been made with the city. Having secured the benefits, it may not now avoid the burdens of the transaction." See also *Ruberoid* v. *Briscoe*, 293 F. 2d 712 (Tex. 1961).

The trial court made no specific written finding as to privity or non-privity; however, it is clear that it did find privity because the court gave as its only reason for not allowing damages based on the market values, before and after, of the machine, the lack of proof as to difference in value. Privity necessarily had to be de-

termined to exist before the court reached that question of value.

2. *The Standard Warranty Covered the Agreement Between the Parties; the Express Warranty Was in Lieu of all Others; it States the Exclusive Measure of Damages.* The warranty before us, which is really in the nature of a disclaimer, violates the UCC in at least two respects. It does not mention *merchantability* nor can it be considered *conspicuous,* both of which are required by Ark. Stat. Ann. § 85-2-316 (Add. 1961). Whether it was conspicuous is for decision by the court. Ark. Stat. Ann. § 85-1-201(10) (Add. 1961). All the documents concerned with the transaction are before us and we are in a position equal to that of the trial judge to determine the question. *Hunt* v. *Perkins Machinery Co.,* 226 N.E. 2d 228 (Mass. 1967). None of the three written instruments executed to initiate and consummate the sale, including an invoice executed by Marion Power Shovel, contained mention of warranty. As we have previously mentioned, the warranty first appeared on the inside of an operation and maintenance manual. That document was not supplied Huntsman until delivery of the machine, for which Marion had already received the purchase price. The *location* of the warranty was considered significant in *Hunt, supra.* Also, see *Dailey* v *Holiday Distributing Corp.,* 151 N.W. 2d 477 (Iowa 1967). We conclude that the written warranty was defective.

3. *All Questions of Warranty Aside the Court Awarded an Improper Measure of Damages.* The sole damages awarded by the trial court were "$9,000 as consequential damages for loss of crops."

Consequential damages are treated in Ark. Stat. Ann. § 85-2-715 (Add. 1961). They may be allowable if the contractor, at the time of the sale, had reason to know of a general or particular requirement of the buyer, and if the failure of the merchandise to produce

those requirements could not reasonably be prevented by cover or otherwise. Applying that law to the recovery here, Marion would have had to have reason to know that Huntsman was depending on this machine to shape his land for production of a 1965 soybean crop and that a substitute machine was not available in case of breakdown. Huntsman's evidence on both these requirements is entirely lacking. Furthermore, the machine was not delivered and assembled until around May 1, 1965. At that time Huntsman had not yet procured an operator. Under those facts it is not reasonable to believe that Marion Power Shovel intended to assure Huntsman at that late date of a 1965 soybean crop. We therefore hold the court erred in allowing consequential damages.

4. *The Testimony Affirmatively Shows Harold Huntsman Caused the Damages He Incurred, if any, Through Abuse of the Machine.* We do not treat the point because we are remanding the case and the question will be again before the court de novo.

Huntsman contends on cross-appeal that the court erred in not awarding damages for the difference in the value of the machine as provided in Ark. Stat. Ann. § 85-2-714(2) (Add. 1961). The court held the evidence "is insuffcient to award damages by such breach of warranty based upon the difference in the price paid for said machine and its market value, if any, in the condition in which the same was delivered." We cannot say the court erred in that respect. Huntsman hedged considerably about giving an opinion of the value of the machine in its delivered condition. He finally said: "Oh, about $20,000." It is not unreasonable to believe that the evidence could be supplied on retrial.

One additional comment should be made for the guidance of the trial court and counsel in the event the case is again tried. Huntsman gave considerable testimony about the loss of several hundred hours of work-

ing time due to breakdowns. He then multiplied those hours by what he alleged to be the fair rental value of the machine and asked for considerable damages for "down-time." The trial court made no award for those claims and the validity of the charges is not briefed on appeal. Statutory damages for breach of warranty are treated in Ark. Stat. Ann. §§ 85-2-714 and 715.

The reason for remand is that law cases generally are remanded unless it is clear that the case has been fully developed. Another reason here for remand is that we perceive the trial court gave credence to the written warranty which is more in the nature of a disclaimer. That warranty should have been voided for the reasons we have stated and the case tried under the doctrine of implied warranty.

Reversed and remanded.