Donald PEARSON, Bert Fried, Don Van Slooten and Ervin Schuh, Plaintiffs, Respondents, and Cross Appellants,

v.

FRANKLIN LABORATORIES, INC., and American Home Products Corp., a corporation, Defendants, Appellants, and Cross Respondents.

Nos. 11552–11559.

Supreme Court of South Dakota.

Reassigned Jan. 6, 1977.

Decided May 26, 1977.

Newell E. Krause of Lakeman & Krause, Mobridge, for plaintiffs, respondents, and cross appellants.

Donald R. Shultz of Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for defendants, appellants, and cross respondents.

WOLLMAN, Justice (on second reassignment).

Defendants appeal from judgments entered in favor of plaintiffs following a consolidated trial to the court of four separate actions for damages resulting from the use of defendants' cattle vaccine. Plaintiffs have cross appealed on the question of damages. We affirm.

Plaintiffs operate ranches in Perkins and Corson Counties, South Dakota. In the spring of 1971, each bought a supply of a combination infectious bovine rhinotracheitis vaccine and leptospira pomona bacterin (hereinafter IBR-Lepto) manufactured by Franklin Laboratories, Inc., (Franklin), a subsidiary of defendant American Home Products Corporation. Infectious bovine rhinotracheitis is an acute, contagious viral infection of cattle characterized by inflammation of the upper respiratory tract. It is also known as "Red Nose" because a common symptom is a crusted nose. The disease was first identified in Colorado in the early 1950's. A Dr. McKercer of the University of California succeeded in attenuating a live IBR virus. Based upon his technique, Cutter Laboratories began manufacturing a vaccine. Franklin, in turn, entered into a licensing agreement with Cutter laboratories and started manufacturing an IBR vaccine and lepto pomona bacterin in a combination product in 1965. Franklin produces approximately two million doses a year of the IBR vaccine. The vaccine purchased by plaintiffs and that used by the other farmers and ranchers whose herds suffered post vaccinal reactions came from a unit of production denominated Serial 651. From this unit of production 47,050 doses of Serial 651–A and 26,450 doses of Serial 651–B were produced and distributed throughout the United States. The only difference between the two subserial numbers was the fact that the subserial A was bottled in 50-dose vials and the subserial B in 25-dose vials. Three thousand eight hundred seventy-five doses of Serial 651–B IBR-Lepto were distributed by retail stores in Bison, Lemmon and McLaughlin, South Dakota, in April and May of 1971.

Plaintiff Fried lives some nine miles northeast of Bison, South Dakota. On May 27 and May 28, 1971, he purchased 80 doses of the IBR-Lepto vaccine from Bison Grain Company. On May 29, 1971, he vaccinated his cows with the vaccine. Prior to being vaccinated the cattle were apparently healthy and in good condition. After being vaccinated the cattle were divided into two herds and placed in separate pastures. Approximately two weeks later plaintiff Fried observed that some cattle in both herds were sick. The sick animals were gaunt, had a yellowish discharge from their eyes, were off feed, dehydrated and lethargic, had a discharge from the nose and suffered from black diarrhea. The sick animals appeared to be running a high temperature, as was evidenced by their peeling noses. Plaintiff Fried notified Bison Grain Company of the sick animals and then called his veterinarian. In all, six yearling heifers, fourteen cows and one calf became ill. One yearling heifer and one calf died. The other nineteen head eventually recovered.

Plaintiff Pearson lives 17 miles southeast of Lemmon, South Dakota. On June 2, 1971, he bought approximately 120 doses of the IBR-Lepto vaccine from Smith's Drug in Lemmon, South Dakota. On June 3, 1971, he vaccinated 118 cows with the vaccine. Prior to being vaccinated the cows had been grazing in two separate pastures approximately five miles apart and appeared to be in good condition. After being vaccinated the cows were returned to their

separate pastures. Approximately two weeks later plaintiff Pearson observed that some of the cows in the home pasture were sick. He went immediately to the other pasture and observed the same problem in that herd. The sick cattle were suffering from a high fever, had red, dry, cracked noses, had yellowish sunken eyes, and were suffering badly from diarrhea. All 118 cows became ill. Thirty-five of them became much sicker than the rest, and of these three died.

Plaintiff Van Slooten lives 27 miles south of Keldron, South Dakota. On May 24, 1971, he bought 110 doses of the IBR-Lepto vaccine from Smith's Drug in Lemmon. On May 29, 1971, he vaccinated 105 cows. Prior to being vaccinated, the cows were in good condition and appeared to be free from disease. After being vaccinated the cattle were divided into two herds and placed in pastures a mile and a quarter apart. On June 12, 1971, plaintiff Van Slooten discovered a dead cow near his stock dam and observed that a number of cows were suffering from black diarrhea and had red, dry, cracked noses and yellow eyes. Most of the cattle were sick; forty-six head were sicker than the rest. Two cows and two yearling heifers died. Nearly all of the calves were sick and 22 calves died.

Plaintiff Schuh lives 20 miles south of McIntosh, South Dakota. On May 24, 1971, he purchased 120 doses of the IBR-Lepto vaccine from Mattern's Store in McIntosh, South Dakota. On May 25, 1971, he vaccinated 112 cows with the vaccine. Prior to being vaccinated, the cattle were in good condition and apparently healthy. On June 16, 1971, plaintiff Schuh observed that some of the cows appeared to be sick. They were gaunt, suffering from diarrhea and had dry, scabby, runny noses and sunken yellowish eyes. In all, fifty-seven cows became ill. Of these, ten cows died, along with three calves.

In addition to the post-vaccinal sicknesses in the herds owned by the four plaintiffs, it was developed at trial that similar symptoms were observed in a herd near Prairie City, South Dakota, a herd near Meadow, South Dakota, a herd near White River, South Dakota, a herd near Bison, South Dakota, a herd near Isabel, South Dakota, and in five herds in the Esmond, North Dakota, area. All of these herds had been vaccinated with Franklin's IBR-Lepto 651-B vaccine.

According to defendants' evidence, Franklin received complaints of sick animals following vaccination with Serial 651-B from the northwest South Dakota area; one complaint from White River, South Dakota; a complaint from a veterinarian in North Dakota; and one complaint from Nebraska. Only a fraction of the cattle in each herd became sick and some of the sick cattle had not been vaccinated with the vaccine.

Dr. David Reed, a virologist and associate professor of veterinary science at South Dakota State University, testified that IBR is caused by a herpes virus and that it takes some five or six different forms. Some of the clinical signs of IBR in cattle are a high fever, crusted and runny nose, and runny eyes. He testified that bovine virus diarrhea (BVD) is a virus disease that has clinical symptoms similar to those in an animal suffering from IBR. He testified further that the use of an improperly attenuated IBR vaccine on stressed animals, such as those brought in from a pasture and run through a chute and vaccinated, could result in the incidence of IBR in any one of its five or six forms. Dr. Reed conducted virus isolation tests on tissues from an animal from plaintiff Pearson's herd and isolated IBR virus from a pool of intestines and spleen. He also conducted virus isolation tests on tissues from animals from the Fried, Van Slooten and Schuh herds, but detected no viral agents. In response to a hypothetical question based upon the clinical symptoms observed in plaintiffs' herds and the other herds in the area that became ill after being vaccinated with Serial 651-B, Dr. Reed testified that in his opinion the vaccine was the cause of the sickness and death that followed its use. He explained that the reason not all of the animals in the

herds became ill following vaccination was that only a percentage of the animals in each herd would be susceptible to IBR. He admitted that with the exception of the Pearson herd he did not know what disease was caused by the vaccine. He also acknowledged that the IBR virus isolated in the Pearson animal could have been the IBR virus contained in the vaccine. He further acknowledged, as did the veterinarians who testified in behalf of plaintiffs, that both IBR and BVD can exist in an animal without the manifestation of any clinical symptoms of those diseases.

All of the veterinarians who examined and treated plaintiffs' cattle following vaccination expressed the opinion that the illness in the cattle resulted from the use of the vaccine. All of the veterinarians acknowledged that a positive diagnosis of IBR or BVD could be made only as a result of a laboratory test that isolated those viruses in animal tissue. Notwithstanding this, however, they all steadfastly maintained their opinions that based upon their experience in diagnosing livestock illnesses from observations of clinical symptoms in the field, the animals in question were suffering illnesses resulting from the use of the vaccine. The veterinarians were in agreement that it is a difficult task to isolate either IBR or BVD virus from tissues taken from dead animals in the field, in view of the fact that in many cases there is a considerable delay between the death of the animals and the delivery of the tissues to the animal health laboratory at Brookings. The evidence revealed that the tissues submitted from plaintiffs' animals were quite decomposed by the time the veterinarians performed the post mortem examinations. The veterinarians were in agreement that the fact that the laboratory test results did not isolate viruses in all of the tissues was not conclusive proof that the animals were not suffering from a virus infection. In this opinion they were joined by Dr. Mailand Vorhies, director of the animal disease, research and diagnostic laboratory and head of the veterinary science department at South Dakota State University, who testified on behalf of defendants. In response to a question on cross-examina-

tion asking whether a negative laboratory finding with respect to tissue necessarily means that the veterinarian was wrong in his diagnosis, Dr. Vorhies replied,

"No. Many times we are unable because of decomposition of tissues, which may be toxic to the cells, for example, and are unable to identify virus or there may be contamination with other bacterial organs (sic, organisms?)."

Dr. Vorhies also testified on cross-examination that,

"There are post vaccinations or actions which I have investigated which would appear to (be) related to vaccination—yes—we know that attenuated viruses modified live do replicate in the body and there are occasions when the body defenses are unable then to control this virulent that does occur that is necessary for the immune response and they are involved in the—with illness—yes."

He went on to explain that a BVD virus and often an IBR virus had been identified through laboratory tests in other cases of virus vaccines which he had investigated and which had been proved to contain extraneous virus.

Defendants called a number of their employees, who testified with respect to the manner in which the IBR-Lepto vaccine was manufactured and tested. In addition, defendants also submitted the testimony of two employees of the United States Department of Agriculture's veterinary services biologics laboratory at Ames, Iowa, the testimony of an associate professor at Texas Agricultural and Mechanical University's experimental station and project leader of that school's feedlot cattle disease research, and the testimony of Dr. Vorhies, whose testimony has been alluded to. Suffice it to say that all of these witnesses appeared to be highly qualified experts in their respective fields of veterinary science and virology. Much of their testimony was highly technical in nature and tended to establish that the Serial 651–B vaccine was manufactured under very exacting standards and had satisfactorily passed all tests, both in the laboratory and in use on controlled

groups of animals. Moreover, the evidence established that there may have been other causes of the illness in the herds in question.

Plaintiffs based their claim for damages upon a claim of breach of implied warranty of fitness of the vaccine. Defendants' answers to the complaints contained a general denial and an affirmative allegation that the vaccine was sold with a notice and disclaimer. It was developed at trial that each bottle of the vaccine was accompanied by a small four-page pamphlet which described the symptoms of IBR and leptospira pomona, described the nature of the IBR-Lepto vaccine and bacterin, contained instructions for restoring the vaccine to liquid form and the dosage to be used, cautioned that the product should not be used on pregnant animals, warned of a possible anaphylactic reaction and prescribed an antidote therefor, and, in the final subparagraph on the last page of the pamphlet, contained the following notice:

"NOTICE

"Franklin IBR-Lepto is produced and tested under the rigid standard of the United States Department of Agriculture. It is a potent product and has passed all of the prescribed tests. Since the company has no control over the conditions under which the product is used; condition or pre-examination of cattle on which it is used, methods of mixing or administration; or ability of cattle to respond to vaccination, we accept no responsibility for the results obtained following its use. No representative of the company may change any of the foregoing, and the buyer hereby accepts the product subject to all the terms hereof."

Notwithstanding the fact that the cases were pleaded and tried on the theory of breach of implied warranty of fitness, the trial court based its decision on the concept of strict liability in tort as adopted by this court in *Engberg v. Ford Motor Co.*, 87 S.D. 196, 205 N.W.2d 104.

Defendants contend that by adopting the Uniform Commercial Code, the legislature precluded the courts from adopting the concept of liability that exceeds the scope of liability created under the warranty provisions of the Uniform Commercial Code. There is support for this position. Titus, "Restatement (Second) of Torts Section 402A and the Uniform Commercial Code," 22 Stan.L.Rev. 713 (1970); see generally, Wade, "Is Section 402A of the Second Restatement of Torts Preempted by the UCC and Therefore Unconstitutional?" 42 Tenn. L.Rev. 123 (1974).

Some courts have taken the position that the adoption of the Uniform Commercial Code did not preclude the adoption by the judiciary of the doctrine of strict liability. See, e. g., *Caruth v. Mariani*, 11 Ariz.App. 188, 463 P.2d 83; *Larson v. Clark Equipment Co.*, 33 Colo.App. 277, 518 P.2d 308; *West v. Caterpillar Tractor Co.*, Fla., 336 So.2d 80; *Berry v. G. D. Searle & Co.*, 56 Ill.2d 548, 309 N.E.2d 550; *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955; *Markle v. Mulholland's, Inc.*, 265 Or. 259, 509 P.2d 529; *Kirkland v. General Motors Corp.*, Okl., 521 P.2d 1353; *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55. At least one court has held that the adoption of the Uniform Commercial Code did not preclude the imposition of liability on bailors and lessors under the doctrine of strict liability in tort. *Martin v. Ryder Truck Rental, Inc.*, Del., 353 A.2d 581.

The Nebraska Supreme Court has held that the doctrine of strict liability in tort is not to be applied in cases involving economic loss resulting from injury to the defective product itself. *Hawkins Contruction Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 642.

■ Although in some cases the courts have not drawn a distinction between the concept of breach of warranty and strict liability in tort, the two doctrines have different bases and are subject to different defenses. In a breach of implied warranty case brought under the provisions of the Uniform Commercial Code, the defenses of lack of notice, the requirement of privity (although to what extent this requirement prevails under South Dakota's version of the Uniform Commercial Code remains

problematical), and disclaimer are available, whereas in a suit based upon strict liability in tort they are not. See, e. g., *Caruth v. Mariani*, supra; *West v. Caterpillar Tractor Co.*, supra; *Berry v. G. D. Searle & Co.*, supra; *Parish v. B. F. Goodrich Co.*, 395 Mich. 271, 284, 235 N.W.2d 570, 576 (Williams, J., dissenting); *Elliott v. Lachance*, 109 N.H. 481, 256 A.2d 153; *Dippel v. Sciano*, supra; 2 Frumer & Friedman, Products Liability, § 16A[4]; J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 12–2 (1972).

█ Apart from the availability of these defenses in a breach of warranty case, there is little difference between the two theories of liability once it has been established that a defect exists in the product that gives rise to the action for damages (laying aside the question of recovery of damages for purely economic use). *Herman v. General Irrigation Co.*, N.D., 247 N.W.2d 472; 2 Frumer & Friedman, supra, § 16A[4]; J. White & R. Summers, Handbook, supra, § 9–8. But see *Brown v. Western Farmers Association*, 268 Or. 470, 521 P.2d 537.

In adopting the doctrine of strict liability in tort in the *Engberg* case, supra, we did not pause to consider the potential conflict between the warranty provisions of the Uniform Commercial Code and the concept of strict liability. In this we were not alone. See, e. g., *Johnson v. American Motors Corp.*, N.D., 225 N.W.2d 57. In *Sweetman Construction Co. v. Dakota Pump, Inc.*, S.D., 226 N.W.2d 792, we did recognize the possibility that there may be some limitations upon the applicability of the strict liability doctrine, but we were not called upon to resolve the issue in that case. Likewise, we conclude that in the instant case the matter of liability could and should have been resolved upon plaintiffs' pleaded theory of breach of implied warranty, and we reserve until another day the question whether the adoption of the Uniform Commercial Code by the legislature has limited our authority to impose a broader concept of liability for damages resulting from defective products.

We turn, then, to an examination of the evidence in the light of the provisions of the South Dakota Uniform Commercial Code.

SDCL 57–4–30 provides:

"Unless excluded or modified (§§ 57–4–34 to 57–4–39, inclusive), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * * "

SDCL 57–4–31 provides in part that:

"Goods to be merchantable must be at least such as

\*　　\*　　\*　　\*　　\*　　\*

"(3) Are fit for the ordinary purposes for which such goods are used;
\*　\*　\*."

SDCL 57–4–33 provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under §§ 57–4–34 to 57–4–39, inclusive, an implied warranty that the goods shall be fit for such purpose."

█ We note that the trial court entered findings of fact to the effect that defendants had implied a warranty that the vaccine was fit for the purpose for which it was sold, that the vaccine was defective and not fit for its purpose, and that defendants had breached their implied warranty. The court then concluded that defendants were liable under the doctrine of strict liability. It is not clear from these findings whether the trial court was speaking of an implied warranty of merchantability under SDCL 57–4–31 or an implied warranty of fitness for a particular purpose under SDCL 57–4–33. There is, of course, a difference between these two types of warranty. J. White & R. Summers, Handbook, supra, § 9–9. cf. *Fulwider v. Flynn*, S.D., 243 N.W.2d 170. As we view plaintiffs' complaints, they allege a cause of action under the theory of breach of implied warranty of fitness of the vaccine for the purpose for

which it was to be used, a claim cognizable under the provisions of SDCL 57–4–31(3).

The first question to be answered is whether IBR-Lepto vaccine was not fit for the purpose for which such vaccines are used and therefore unmerchantable within the meaning of SDCL 57–4–31, and, if so, whether such unfitness was the cause of the sickness and death in plaintiffs' herds.

▪ Defendants strenuously contend that not only did plaintiffs fail to establish that the vaccine was defective, the trial court stated in its memorandum decision that it would not attempt to isolate the possible specific causative agent or agents in the vaccine that caused the outbreaks of illness in the livestock. It is true that plaintiffs' witnesses were unable to demonstrate that the vaccine was contaminated or otherwise unfit or defective. It is also true that defendants' evidence tended to show that the vaccine had passed all tests, both Franklin's and those of Texas A. & M. University and the United States Department of Agriculture's biologic laboratories. On the other hand, plaintiffs' evidence supports the trial court's findings that plaintiffs' cattle, as well as cattle in other herds, had become ill within the approximate time span and with the same clinical symptoms after being vaccinated with the Serial 651–B vaccine, whereas herds that had been vaccinated with other serials of defendants' vaccines and like vaccines manufactured by other drug manufacturers did not become ill. To require plaintiffs to submit greater evidence than the testimony of the veterinarians, who to a person stood by their opinions that the illness was caused by defendants' vaccine, together with the circumstantial evidence, would be to require a degree of proof that goes beyond the standard of preponderance of the evidence. Defects in products can be shown by circumstantial as well as by direct evidence. As we said recently in *Shaffer v. Honeywell, Inc.*, S.D., 249 N.W.2d 251, 256, "No specific defect need be shown if the evidence, direct or circumstantial, permits the inference that the accident was caused by a defect." See also *Sweetman Construction Co. v. Dakota Pump, Inc.*, supra; *Kupkowski v. Avis Ford, Inc.*, 395 Mich. 155, 235 N.W.2d 324. As Professors White and Summers have stated:

> "*Post hoc propter hoc* is normally not enough; the plaintiff must show more than that the goods injured the plaintiff in a certain way. However, it is not always necessary that the plaintiff offer expert testimony or explicit proof to disclose the precise chain of causation. * * Of course, other courts have required plaintiffs to go to greater lengths to rule out rival plausible hypotheses, and it appears that in most cases the plaintiff will wish to procure expert testimony. However, when the connection between the product and the injury is reasonably obvious even to a layman, expert proof and explicit analysis of the chain of causation should not be necessary." J. White & R. Summers, Handbook, supra, § 9–8, at 296.

Here plaintiffs did offer expert testimony to support their claims. That the veterinarians by their own admission were not specialists in virology and had not conducted any laboratory tests of the vaccine did not preclude the trial court from accepting their testimony, buttressed by the circumstantial evidence, that the illness resulted from the use of the vaccine. Likewise, the fact that defendants' evidence tended to establish that there were other possible causes of the illness in plaintiffs' herds did not foreclose a finding by the trier of fact that defendants' vaccine was in fact unfit and the cause of the illness. *C. A. Hoover & Son v. O. M. Franklin Serum Co.*, Tex., 444 S.W.2d 596.

▪ In weighing the evidence against the trial court's findings, we have given due regard to the fact that many of defendants' expert witnesses testified in the presence of the trial court, some on adverse as well as on direct, whereas with one exception, Dr. Reed, plaintiffs' experts, the veterinarians, testified by deposition. Although the "clearly erroneous" rule of SDCL 15–6–52(a) does not apply to testimony introduced by deposition, *Geo. A. Clark & Son, Inc. v. Nold*, 85 S.D. 468, 185 N.W.2d 677,

after making due allowance for the bias in favor of plaintiffs that two of the veterinarians frankly admitted, we are satisfied that the trial court's findings are amply supported by the evidence. In reaching this conclusion we have not overlooked this court's decision in *Murphy v. Sioux Falls Serum Co.*, 47 S.D. 44, 195 N.W. 835. Suffice it to say that the claim of liability in that case was predicated upon the negligence of the manufacturer of the hog serum. The factor of negligence is of no relevance in establishing a breach of warranty case under the Uniform Commercial Code. J. White & R. Summers, Handbook, supra, § 9–6. Moreover, the circumstantial evidence in terms of the incidence of illness following the use of the serum bore no relationship to that in the instant cases. We express no opinion whether the outbreak of illness in only one herd following the use of defendants' IBR-Lepto vaccine would have been sufficient to sustain a finding that the vaccine was unfit and was the cause of the illness.

There remains the question of defendants' defense of disclaimer (defendants have not raised the defenses of lack of privity or notice). We have already set forth the terms of the purported disclaimer above.

SDCL 57–4–35 provides:

"Subject to §§ 57–4–36 to 57–4–38, inclusive, to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'there are no warranties which extend beyond the description on the face hereof.'"

SDCL 57–4–36 provides:

"Notwithstanding § 57–4–35, unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty."

As SDCL 57–4–35 makes clear, any attempt to exclude or modify the implied warranty of merchantability must mention merchantability and must be conspicuous if in writing. We conclude that defendants' attempt to disclaim its implied warranty of merchantability fails both tests. First, of course, the disclaimer does not mention the word merchantability. Second, the writing is not conspicuous. In defining terms applicable to the Uniform Commercial Code, SDCL 57–1–2 provides that:

"* * * *

"(10) 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous.' Whether a term or clause is 'conspicuous' or not is for decision by the court. * * * *"

The test whether a written provision disclaiming a warranty is conspicuous is whether attention can reasonably be expected to be called to it. Uniform Commercial Code § 1–201, Comment 10. Under SDCL 57–4–35 and the last sentence of SDCL 57–1–2(10), it is a question of law for the court whether a provision purporting to disclaim an implied warranty of merchantability is conspicuous, and an appellate court is in as good a position to decide that issue as is the trial court where the purported disclaimer is a part of the record on appeal. *Marion Power Shovel Co. v. Huntsman*, 246 Ark. 152, 437 S.W.2d 784; *Hunt v. Perkins Machinery Co.*, 352 Mass. 535, 226 N.E.2d 228. We conclude that the disclaimer in question is not conspicuous because it appears in the same size of type and on the

last page of the pamphlet extols the virtues and the effectiveness of the vaccine. Indeed, within the notice and disclaimer paragraph itself is a reaffirmation of the potency of the vaccine and an assertion that it has passed all of the prescribed tests. We doubt that a busy rancher would pore over the last few lines of the paragraph after earlier being assured of the safety and effectiveness of the vaccine, the directions for its use, and the steps to be taken should an anaphylactic reaction occur. Language more conspicuous than this has been held to be ineffective as a disclaimer. *Hunt v. Perkins Machinery Co.,* supra. See also *Mack Trucks of Ark., Inc. v. Jet Asphalt & Rock Co.,* 246 Ark. 101, 437 S.W.2d 459; *Mobile County Gas District v. National Cash Register Co.,* 295 Ala. 188, 326 So.2d 105; *Geo. C. Christopher & Son, Inc. v. Kansas Paint & Color Co., Inc.,* 215 Kan. 185, 523 P.2d 709; *Baker v. City of Seattle,* 79 Wash.2d 198, 484 P.2d 405; Annot. 17 A.L.R.3d 1010, § 26. Cf. *Kleven v. Geigy Agricultural Chemicals,* 303 Minn. 320, 227 N.W.2d 566.

Likewise, we conclude that the disclaimer is not effective under the provisions of SDCL 57-4-36. Disclaimers of warranty are to be strictly construed against the seller. *Hauter v. Zogarts,* 14 Cal.3d 104, 120 Cal.Rptr. 681, 534 P.2d 377; *Woodruff v. Clark County Farm Bureau Coop. Ass'n, Inc.,* 153 Ind.App. 31, 286 N.E.2d 188. We held as much in *Swenson v. Chevron Chemical Co.,* S.D., 234 N.W.2d 38. That case involved an express warranty, it is true, as did *Hauter v. Zogarts,* supra, but we see no reason to differentiate between express and implied warranties in this regard. The phrase " * * * we accept no responsibility for the results following its use," buried in the middle of the purported disclaimer is ambiguous at best. Does it mean that defendants disclaim responsibility for the possible failure of the vaccine to prevent the outbreak of diseases it was intended to prevent, is it an attempted exclusion of liability for illnesses caused by the vaccine itself, or is it both? We do not believe that a purchaser should be required to make these nice distinctions.

Our conclusion that defendants' purported disclaimer is ineffective under SDCL 57-4-36 because of its ambiguous wording obviates the necessity of our deciding whether a disclaimer under this section of the Uniform Commercial Code is also governed by the requirement of conspicuousness applicable to disclaimers under SDCL 57-4-35, a question on which the authorities are divided. Compare *Woodruff v. Clark County Farm Bureau Coop. Ass'n,* supra; *Fairchild Industries v. Maritime Air Service,* 274 Md. 181, 333 A.2d 313; *Gindy Manufacturing Corp. v. Cardinale Trucking Corp.,* 111 N.J.Super. 383, 268 A.2d 345, with *DeKalb Agresearch, Inc. v. Abbott,* N.D.Ala., 391 F.Supp. 152, aff'd Fifth Circuit, 511 F.2d 1162. See also J. White & R. Summers, Handbook, supra, § 12-6 at 368.

### CROSS APPEAL ON DAMAGES

Relying upon this court's decision in *Overpeck v. City of Rapid City,* 14 S.D. 507, 85 N.W. 990, the trial court awarded plaintiffs their costs of treatment and labor in caring for the sick animals, together with damages for lost calf production and for the loss of value of the sick animals based upon their value after they had recovered from their illness. Although plaintiffs contend that the trial court should have applied the measure of damages discussed in *Olson v. Aldren,* 84 S.D. 292, 170 N.W.2d 891, and *Hall v. Umiker,* 87 S.D. 362, 209 N.W.2d 361, they conceded at oral argument that had defendants not appealed, plaintiffs would not have appealed on the question of damages. Without belaboring the point, we conclude that the trial court did not err in the manner in which it awarded damages.

The judgments are affirmed in all respects.

All the Justices concur.