SANCO, INC., Plaintiff-Appellant,

v.

FORD MOTOR CO.,
Defendant-Appellee.

SANCO, INC., Plaintiff-Cross-Appellee,

v.

FORD MOTOR CO.,
Defendant-Cross-Appellant.

Nos. 84–1503, 84–1566.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1985.

Decided Aug. 29, 1985.

**1082**

J.J. Paul, III, Indianapolis, Ind., for plaintiff-appellant.

Ice Miller, Donadio & Ryan, Indianapolis, Ind., for defendant-appellee.

Before CUDAHY and ESCHBACH, Circuit Judges, and BROWN, Senior District Judge.[*]

ESCHBACH, Circuit Judge.

In this diversity action in which Indiana law controls, Sanco, Inc. sued Ford Motor Company alleging negligence in the design and manufacture of Ford Model CLT 9000 trucks purchased by Sanco, and breach of an implied warranty of merchantability covering the trucks. The district court entered summary judgment for Ford on the negligence count, 579 F.Supp. 893 (S.D.Ind. 1984), and a jury found for Ford on the warranty count.

In this appeal,[1] we are required to decide whether the district court correctly determined that Indiana would not recognize a cause of action in tort for the recovery of purely economic injury arising out of a transaction covered by the Uniform Commercial Code. We are also asked to decide whether trial error requires a reversal of the jury's verdict. We affirm.

## I.

Philip Wiseman is president of Fairway Ford, Inc., a Ford dealership that sells, among other things, tractor-trailer trucks. Wiseman is also president and controlling shareholder of Sanco, Inc., a heavy truck leasing company. In the spring of 1977, Wiseman met with Charles Hennessey, a Ford heavy truck salesman. Hennessey informed Wiseman that Ford was introducing a new model heavy truck, and discussed with Wiseman the possibility of placing a model fleet of these trucks with Sanco through Fairway Ford. No agreement on the model fleet was reached.

Soon after this discussion, Sanco ordered thirty of the new model CLT 9000 trucks through Fairway Ford. (Sanco eventually purchased 42 CLT 9000 trucks through Fairway Ford, 36 of which are involved in this lawsuit.)

Sanco experienced a myriad of difficulties with the trucks. The most serious of the problems centered on the malfunction of many of the engines. The engines were manufactured by Detroit Diesel Allison Division of General Motors ("DDA"). After Sanco attempted without complete satisfaction to get relief from the problems from

---

[*] The Honorable Wesley E. Brown, of the United States District Court for the District of Kansas, sitting by designation.

1. Ford purports to take a cross-appeal from the judgment below. This cross-appeal was unnecessary, for a party willing to accept a judgment, as Ford is willing to do, need not take a cross-appeal in order to present all the arguments that will enable him to retain the benefit of the judgment. *See, e.g., Langnes v. Green,* 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520 (1931).

Ford and DDA, it parked the trucks in April 1980. The trucks were repossessed by a finance company in January 1981.

Sanco then filed its two-count complaint against Ford in the district court. Count I alleged that Ford had negligently designed and manufactured the CLT 9000 trucks. Count II alleged that Ford had breached an implied warranty of merchantability. Ford moved for summary judgment on both counts. The district court granted Ford's motion for summary judgment on Count I, finding that Indiana law, which controls in this diversity action, precluded Sanco from recovering for purely economic losses under a negligence theory. Count II, Sanco's implied warranty claim, was tried before a jury.

At trial, Ford's defense was based upon the existence of an express warranty, contained in warranty booklets that accompanied the trucks, that disclaimed all implied warranties and that limited Sanco's remedies in certain ways. Under the terms of the warranty as expressed in the warranty booklet, Ford did not warrant the DDA engines. Rather, the engines were warranted solely by DDA.

Ford's dealership agreement with Fairway Ford included the following provision:

The Company [i.e., Ford] shall from time to time establish, by notice to the dealer, the warranty to the owner applicable to each HEAVY DUTY TRUCK. There shall be NO OTHER WARRANTY, express or implied, including any warranty of MERCHANTABILITY OR FITNESS or any other obligation of the Company to the Dealer or the owner with respect to the HEAVY DUTY TRUCK or any part thereof except the warranty established pursuant to this subparagraph. The Dealer shall expressly incorporate the warranty as a part of each buyer's order form or other contract for the sale of a HEAVY DUTY TRUCK and shall deliver a copy of the warranty in the form furnished by the Company, to the owner at the time the HEAVY DUTY TRUCK is delivered to the owner....

Wiseman, as president of Fairway Ford and Sanco, executed the order for the CLT 9000 trucks. Wiseman had sold 1500 to 2000 heavy duty Ford trucks during his ten years as a Ford heavy truck dealer, and testified that warranty booklets accompanied the trucks he had sold. He also testified that he was aware, before he purchased the trucks, that DDA gave a separate warranty on the engines.[2] Moreover, Wiseman had filled out the warranty cards on the CLT 9000 trucks,[3] and Wayne Wiseman, his son, testified that warranty claims for the CLT 9000 trucks were filed with Ford on standard Ford warranty claim forms. Ford paid many of these claims.

Sanco sought unsuccessfully to introduce testimony by Wiseman and another witness to the effect that Ford routinely disregarded the limitations provisions in the warranty booklet and had a practice of helping to repair trucks after the warranty's provisions had expired. The district court excluded the proposed testimony, and instructed the jury that Ford had proved its affirmative defense of exclusion of implied warranty and limitation of remedy. It went on to instruct the jury that, notwithstanding the exclusion of implied warranties, Sanco could still recover if the limited remedies provided by Ford's warranty booklet "failed of their essential purpose" within the meaning of Ind.Code § 26–1–2–719(2).[4] The jury returned a verdict for Ford.

**2.** Fairway Ford was also a DDA-approved franchise.

**3.** The purpose of the warranty cards was to assure that the owners or operators of the trucks could obtain service under the warranty from Ford dealerships.

**4.** Indiana Code § 26–1–2–719 states in pertinent part:

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of

## II.

### A. Count I: Negligent Design and Manufacture

In Count I, Sanco sought recovery under a tort theory of negligent design and manufacture for economic losses occasioned by the problems it had experienced with the trucks. After finding no Indiana authority directly on point, the district court determined that Indiana would not permit recovery for such losses in tort, and held that Sanco was limited to its warranty remedies. Accordingly, the district court granted summary judgment in favor of Ford on Count I. Sanco argues that in so doing, the district court ignored Indiana authority that, it claims, indicates Indiana would allow Sanco to maintain a negligence action under the facts of this case.

The allegations of Sanco's complaint indicate that it seeks to recover the cost of repairs to the trucks and lost profits. As the district court correctly recognized, courts are divided over whether such losses may be recovered in a negligence action or whether, instead, a buyer is limited to his contractual and warranty remedies under the Uniform Commercial Code. The majority of jurisdictions that have considered this issue have not permitted the recovery of purely economic losses in a negligence or strick liability action.[5] *See, e.g., Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165 (3d Cir.1981) (Pennsylvania law); *Vulcan Materials Co. v. Driltech, Inc.*, 251 Ga. 383, 306 S.E.2d 253 (1983); *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784 (1978); *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982); *Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc.*, 136 Ariz. 444, 666 P.2d 544 (Ariz.App.1983).

Dean Prosser summarized the majority rule. with respect to recovery of economic losses as follows:

> There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself, as where an automobile is wrecked by reason of its own bad brakes, as well as damage to any other property in the vicinity. But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule ... that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery.

W. Prosser, Handbook on the Law of Torts, § 101 at 665 (4th ed. 1971). A persuasive explanation for this rule is found in Justice Traynor's majority opinion in *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). In *Seely*, the plaintiff sought recovery of lost profits and a refund of the purchase price of a defective truck. The California Supreme Court held that such damages, while recoverable in a breach of warranty action, were not recoverable in a strict liability action:

> The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his

---

the price or to repair and replacement of nonconforming goods or parts; and

   (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

   (2) Where circumstances cause an exclusive or limited remedy to fail of its essential pur-

pose, remedy may be had as provided in this Act.

**5.** The district court defined these losses as "the diminution in value of a product and consequent loss of profits because the product is inferior in quality and does not work for the general purposes for which it was manufactured and sold."

goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injury and there is no recovery for economic loss alone.

63 Cal.2d at 18, 45 Cal.Rptr. at 23, 403 P.2d at 151 (citations omitted).

Some jurisdictions have embraced a contrary view, most following the reasoning of the New Jersey Supreme Court in *Santor v. A. & M. Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965). *See, e.g., Mead Corp. v. Allendale Mutual Insurance Co.*, 465 F.Supp. 355 (N.D.Ohio 1979); *Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602, 182 N.W.2d 800 (1970); *City of LaCrosse v. Schubert, Schroeder & Associates*, 72 Wis.2d 38, 240 N.W.2d 124 (1976). Interestingly, however, the New Jersey Supreme Court has recently limited the *Santor* decision to cases involving noncommercial buyers. *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660 (1985). The New Jersey court determined that, in cases involving commercial parties, the provisions and purposes of the Uniform Commercial Code would be distorted by allowing recovery for purely economic losses under a tort theory. *Id.*, at 566, 489 A.2d at 671. The court reasoned that by enacting the U.C.C., the legislature had adopted "a carefully conceived system of rights and remedies to govern commercial transactions," and that application of tort principles to such transactions would dislocate the legislative structure. *Id.; see also Seely, supra,* 63

Cal.2d at 19, 45 Cal.Rptr. at 22, 403 P.2d at 150.

The district court in the instant case concluded:

[I]f a negligence cause of action were available, Sanco could recover despite any effective disclaimer of warranty under Ind.Code 26–1–2–316, or any failure of Sanco to adhere to the notice requirements of Ind.Code 26–1–2–316. [T]his result would represent an unwarranted extension of the traditional boundaries of tort law into an area that [the] legislature, by enacting the Uniform Commercial Code, has provided with a finely tuned mechanism for dealing with the rights of parties to a sales transaction with respect to economic losses. We are confident that the Supreme Court of Indiana would view unfavorably any encroachment of tort law on the sales scheme of the Uniform Commercial Code.

Sanco argues that, in reaching this conclusion, the district court ignored two cases it claims demonstrate Indiana's adoption of the minority view on this issue. In *Barnes v. Mac Brown & Co.*, 264 Ind. 227, 342 N.E.2d 619 (1976), plaintiffs, subsequent purchasers of a house, sought recovery against a builder-vendor for breach of an implied warranty of habitability when the house's basement walls developed extensive cracks. The builder defended on the ground that it was not in privity of contract with the plaintiffs. The question before the court, then, was whether lack of privity should bar plaintiffs' action on the implied warranty. In determining that it should not, the court rejected the suggestion of the dissent that the privity requirement was more appropriately relaxed in tort cases involving personal injury than in warranty cases, stating that the distinction between personal injury and economic loss was without merit.

Sanco seizes on this language to support its argument that it should be allowed to proceed in tort for recovery of purely economic losses. We do not believe that *Barnes* is authority for Sanco's position, as

that court was not confronted with the issue involved in this case. Rather, the *Barnes* court was faced with an action on a warranty, in which recovery for economic losses is traditionally appropriate. Thus, the court was not required to consider the collision between tort principles and the carefully-wrought provisions of the U.C.C. that informed the district court's conclusion below.

*Essex v. Ryan*, Ind.App., 446 N.E.2d 368 (1983), upon which Sanco also relies, provides even less support for its position than does *Barnes*. In *Essex*, the question before the court was whether *Barnes* required that privity requirements be abolished for negligence actions on personal service contracts (specifically, on a claim that a survey had been negligently performed). The court refused to relax the privity requirement for such actions. Needless to say, personal service contracts are not subject to the U.C.C., and *Essex* contains no discussion relevant to the issue here.

█ We agree with the district court that Indiana would follow the majority view and deny a cause of action in tort for the recovery of losses such as Sanco's. Accordingly, we affirm the grant of summary judgment in favor of Ford on Count I.[6]

### B. Count II: Implied Warranty of Merchantability

The district court instructed the jury that inasmuch as the limited warranty and exclusion of implied warranty of merchantability, as set out in Ford's Warranty Facts Booklet and the Detroit Diesel Allison warranty booklet, were admittedly known to the president of Sanco at the time of Sanco's purchase of the trucks, and known to him to be the routine and only way in which Ford warranted its trucks and engines, such documents formed a part of the agreement of sale as a matter of law. Therefore, the de-

fendant has proved its first affirmative defense [of disclaimer and limitation of remedies].

Sanco's brief raises a tangle of issues concerning this instruction. We shall try to untangle, and address, these arguments in turn.

1.

█ Sanco first argues that the district court improperly found the warranty facts booklets were part of the agreement of sale between Sanco and Ford. In order to form a part of that agreement, Sanco argues, there would have to be evidence that Sanco consciously bargained for the warranties. *See e.g., Royal Business Machines v. Lorraine Corp.*, 633 F.2d 34, 46 (7th Cir.1980). We agree with Sanco that, as a general proposition, a seller may not "spring" a warranty disclaimer on a customer after a sale has been consummated; the parties must have understood that the warranty, and any disclaimers or limitations, were part of their deal. We believe that the evidence here conclusively establishes that both parties fully expected the warranty booklets, and the limitations and disclaimers contained therein, to be part of the sale of the trucks. We cannot ignore the fact that Philip Wiseman, president of both Sanco and Fairway Ford, placed the order for the trucks with Ford Motor Company, and that Wiseman knew that Ford only warranted the trucks in the manner described in the warranty booklet. In fact, Fairway Ford's dealership agreement with Ford makes it clear that Wiseman could have had no expectation that any other warranty would protect the trucks. Had Wiseman sold the trucks through his dealership to any other party, it would be abundantly clear that he would be in violation of his agreement with Ford were he not to disclaim any implied warranties. Moreover, Wiseman testified that he knew the DDA engines were separately warranted by DDA before he purchased the trucks.

---

**6.** Sanco argues on appeal that some of the problems with the trucks were such that they might have caused personal injuries, and thus that it should have been allowed to proceed in tort. This argument was not presented to the district court and we will not now consider it.

We believe that the district court's conclusion that the booklets were a part of the agreement as a matter of law was correct.[7]

### 2.

Sanco argues that even if the warranty booklets were part of its agreement with Ford, the district court erred in excluding testimony by Wiseman and another witness to the effect that Ford had routinely ignored the limitations of remedies provisions in the booklets when dealing with heavy trucks. Under Sanco's view, the warranty's inclusion in the agreement was established through course of dealing evidence, and it was unfair to exclude other course of dealing evidence tending to show that Sanco did not expect Ford to rely on the limitations of remedy provided in the warranty booklets.

It is important to remember, however, that Sanco's theory of liability is based on an implied warranty of merchantability. The warranty booklet established the following things: (1) that Ford expressly warranted its own parts for 12,000 miles or one year, whichever came first; (2) that Ford did not warrant DDA engines at all; (3) that Ford disclaimed all implied warranties; and (4) that Ford limited the remedies available under its express warranty to repair and replacement in certain instances. It is also important to distinguish between a disclaimer of implied warranties and a limitation of remedies. *See, e.g., Hahn v. Ford Motor Co.,* Ind.App., 434 N.E.2d 943, 952–53 (1982) (distinguishing between disclaimer and limitations of remedy); *see also Richards v. Goerg Boat & Motors, Inc.,* 179 Ind.App. 102, 384 N.E.2d 1084 (1979) (court first determined whether implied warranties had been effectively disclaimed; finding that they had not, court then considered whether limitations on remedies under express warranties were effective).

█ Sanco's proffered evidence was perhaps relevant to the question whether Ford was estopped to rely on the limitations of remedies provision. Sanco's theory of recovery, however, was not that Ford had unjustifiably hidden behind the remedy limitations in its warranty booklet. Rather, it was that Ford had sold unmerchantable trucks in violation of an implied warranty of merchantability. Evidence that Ford could not rely on its limitations provision would not also show that Ford could not rely on its disclaimer of implied warranty provision. The two provisions are distinct. The fact that the remedies provided might not be exclusive does not mean that an effectively disclaimed warranty of merchantability was somehow resurrected. Accordingly, the evidence excluded was irrelevant to any issue in the case, and its exclusion was proper.

### 3.

█ Sanco also argues that the disclaimer of implied warranties is ineffective because Charles Hennessey made certain representations in the course of discussing the possibility of placing a model fleet with Sanco that amount to express warranties. We first note that Sanco did not pursue a theory of recovery based on express warranty below. Moreover, Hennessey testified without contradiction that no agreement had been reached concerning placing a model fleet with Sanco.

More importantly, however, Hennessey's representations were relevant only to the

---

7. Sanco's argument that the disclaimers of warranty were not conspicuous, *see* Ind.Code § 26–1–2–316(2), because Wiseman claims to have first seen the warranty booklets in the glove boxes of the trucks after delivery, fails. In *Hahn v. Ford Motor Co.,* Ind.App., 434 N.E.2d 943, 948 (1982), the court rejected this argument as a matter of law. Moreover, this is not a case, such as *Marion Power Shovel Co. v. Huntsman,* 246 Ark. 152, 437 S.W.2d 784 (1969), cited by Sanco, in which a consumer first becomes aware of a disclaimer when he examines a warranty booklet delivered after he has accepted delivery of, and paid for, the product. Wiseman's long relationship with Ford Motor Company removes him from the category of innocent consumers.

question of whether the limitations of remedies provision was exclusive. According to Wiseman and Hennessey, if a model fleet were placed with Sanco, Hennessey expected Ford to monitor the fleet and expected Ford engineers to "follow up" on the trucks' performance and correct problems, if possible. Sanco's conclusion that such representations somehow resurrect, or contradict, a disclaimer of implied warranty is incorrect.[8] For the reasons expressed in Section 2, *supra,* we find no error with respect to this evidence.[9]

### C. Instruction on Failure of Essential Purpose Doctrine

■ The court instructed the jury that, notwithstanding Ford's proof of its affirmative defense of disclaimer of implied warranty and limitation of remedies, Sanco could still recover if it could show that the limitation of remedies provision "fail[ed] of its essential purpose" as that term is used in Ind.Code § 26–1–2–719(2). Both parties agree that, if Ford effectively disclaimed

any implied warranty of merchantability, then the instruction is irrelevant to any issue in the case. We find no prejudice to Sanco from this instruction, however; if anything, it gave Sanco an unwarranted chance for victory on a theory it did not advance below.[10]

### III.

For the reasons expressed above, the judgment of the district court is affirmed.

---

8. Ind.Code § 26–1–2–316(1) states:

   Words or conduct relevant to the creation of an express warranty and words and conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this UCC Article on parole or extrinsic evidence (IC 26–1–2–202) negation or limitation is inoperable to the extent that such construction is unreasonable.

   Sanco argues that Hennessey's representations concerning the model fleet were "words ... relevant to the creation of an express warranty," and that it is unreasonable to construe Hennessey's words as consistent with the warranty booklet's disclaimer of implied warranties. Even if Sanco had pursued a theory of express warranty below, and even if we could find that the representations were definite enough to constitute express warranties, we cannot agree that Hennessey's statements could not be reasonably construed as consistent with the disclaimer. As noted in the text, Hennessey's statements were concerned with remedies. Hennessey testified that when a model fleet was launched, Ford would "monitor" the fleet through a service engineer, who would "watch for problems and correct them if possible." Wiseman testified Hennessey told him that Ford wanted to place model fleets so Ford could then "monitor [them] and take care of some of the problems that may or may not arise." No one testified that Ford would repair truck engines, nor was

there any testimony that Hennessey made representations concerning the quality or merchantability of the trucks. Therefore, we believe it is reasonable to construe Hennessey's representations as consistent with the disclaimers of implied warranty, even though it might be unreasonable to construe the representations as consistent with the limitations of warranty provisions.

9. Sanco argues that Ford's conduct in attempting to repair problems in the trucks, and attempting to get DDA to repair engines, created warranties of cure, citing Ind.Code § 26–1–2–210 (Delegation of Performance). We are entirely unclear what application the above-cited section has to this case. However, we need not address Sanco's arguments in this regard for it offered no instruction concerning warranties of cure, nor did it argue this theory to the district court. While Sanco tendered an instruction to the effect that delegation of a duty does not relieve the party delegating of any duty to perform, the only duty referred to in Sanco's other instructions is the duty arising under an implied warranty of merchantability.

10. Given our conclusions on the other issues raised in the case, we need not address Sanco's argument that the instructions concerning measure of damages were incorrect, nor need we address any issue raised by Ford in its purported cross-appeal.