Roy A. CLINE and Gertrude F. Cline, his wife, Plaintiffs Below, Appellants,

v.

PROWLER INDUSTRIES OF MARY-LAND, INC., a Maryland Corporation; Motor Wheel Corporation, an Ohio Corporation; Robert G. Horsey, t/a Parkview Trailer Sales, Defendants Below, Appellees.

PROWLER INDUSTRIES OF MARY-LAND, INC., Defendant Below, Appellant,

v.

Robert G. HORSEY, t/a Parkview Trailer Sales, Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted Nov. 14, 1979.

Decided June 3, 1980.

E. Leigh Hunt and Samuel V. Abramo, Wilmington, for plaintiffs below, appellants.

James W. Semple of Flanzer & Isaacs, Wilmington, for appellee Prowler Industries of Maryland, Inc.

William F. Taylor and Frederick W. Iobst of Young, Conaway, Stargatt & Taylor, Wilmington, for appellee Motor Wheel Corp.

Wayne N. Elliott of Prickett, Sanders, Jones, Elliott & Kristol, Wilmington, for

appellee Robert G. Horsey, t/a Parkview Trailer Sales.

Before HERRMANN, C. J., and DUFFY, McNEILLY, QUILLEN and HORSEY, JJ., constituting the Court en Banc.

HERRMANN, Chief Justice:

In this appeal we are required to decide, *inter alia*, whether the doctrine of strict liability in tort is applicable in Delaware in cases involving sales of allegedly defective goods.[1]

## I.

In late May, the plaintiffs, Roy and Gertrude Cline, purchased a travel-trailer from the defendant Robert Horsey. The trailer was manufactured by the defendant Prowler Industries of Maryland, Inc. (hereinafter "Prowler") and was heated by a propane heater manufactured by the defendant Motor Wheel Corporation (hereinafter "Motor Wheel"). The heater was installed by Prowler.

During the approximately four months between the date of purchase and the incident giving rise to this litigation, the trailer was used by the plaintiffs on two long trips. The heater was not used prior to October of the year, however, because only summer months had intervened since the purchase of the trailer. In October, the plaintiff Roy Cline entered the trailer for the purpose of "winterizing" the vehicle. He turned the heater on in conformity with his understanding of the instructions riveted to the heater. An explosion resulted, seriously injuring the plaintiff: he sustained third degree burns and required extensive hospitalization and multiple surgical procedures, in-cluding skin grafts and amputation of several fingers.

The plaintiffs brought suit against Prowler, Motor Wheel and Horsey. The complaint contained counts based upon the doctrine of strict tort liability, breach of warranty under the Uniform Commercial Code, 6 *Del.C.* § 2–101 *et seq.*, and negligence. Thereafter, the plaintiffs' insurer brought an identical suit against the same defendants, plus an additional defendant, Parkview Trailer Sales, to recover payments it had made to the plaintiffs. By motion, the two actions were consolidated for trial by jury.

At the close of all the evidence, a directed verdict was granted in favor of Horsey on the ground that the evidence failed to establish either any negligence on his part or any independent liability–since he was merely a conduit for Prowler products. In instructing the jury, the Trial Judge refused to instruct either on the doctrine of strict liability in tort or of *res ipsa loquitur*. The jury returned verdicts in favor of Prowler and Motor Wheel, finding, upon special interrogatories, that neither was guilty of negligence or breach of warranty.

The Trial Court denied the plaintiffs' motion for judgment n. o. v. or, in the alternative, new trial. The Court granted the motion of Horsey for legal expenses and attorneys fees from Prowler under Superior Court Rule 37(c).[2]

The plaintiffs appeal from the denial of their motion for judgment n. o. v. or new trial. Prowler appeals from the grant of Horsey's motion for expenses and attorney's fees.

---

1. See *Martin v. Ryder Truck Rental, Inc.*, Del. Supr., 353 A.2d 581 (1976) expressly reserving this question, but holding the doctrine applicable to a bailment–lease.

2. Superior Court Rule 37(c) states:

   "(c) Expenses on Failure to Admit. If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the *admissions thereafter proves the genuineness* of the document or the truth of the matter, he may apply to the Court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The Court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 36(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that he might prevail on the matter, or (4) there was other good reason for the failure to admit."

## II.

The crux of the plaintiffs' appeal is the Trial Judge's refusal to apply the doctrine of strict liability in tort or *res ipsa loquitur.* In asserting that strict tort liability is the law of Delaware in cases involving the sale of defective goods, the plaintiffs rely heavily on *Martin v. Ryder Truck Rental, Inc.,* Del.Supr., 353 A.2d 581 (1976). In that case, this Court held that strict tort liability is applicable in this State to a bailment–lease.

■ As was expressly noted in *Martin,* however, the applicability of the doctrine of strict tort liability is dependent in this State on the scope of the Uniform Commercial Code, 6 *Del.C.* § 2–101 *et seq.* It was held in *Martin* that if by the Code the General Assembly preempted the field of the law of products liability, this Court was not free to apply the doctrine of strict tort liability to a bailment–lease. This Court there concluded, however, that leases and bailments were not within the purview of the Uniform Commercial Code; that the Code's relevant provisions are restricted to sales; and that, therefore, while the General Assembly may have preempted the field as to sales, it had not done so as to bailment–leases. 353 A.2d at 583–4.

Now, we are faced with the question expressly reserved in *Martin* : [3] whether the Uniform Commercial Code provisions on sales of goods preempt the entire field, thus preventing the extension of the doctrine of strict tort liability to the law of sales. This is a case of first impression in this Court; it has been addressed by the courts of only a small minority of other states. Indeed, those courts that have been faced with the question have chosen either to avoid it, *Pearson v. Franklin Laboratories, Inc.,* S.D. Supr., 254 N.W.2d 133, 139 (1977), or to conclude cursorily that no preemption exists. *Caruth v. Mariani,* Ct.App.Ariz., 11 Ariz.App. 188, 463 P.2d 83 (1970); *Larson v. Clark Equipment Company,* Colo.Ct.App., 33 Colo.App. 277, 518 P.2d 308 (1974); *West v. Caterpillar Tractor Company, Inc.,* Fla., 336 So.2d 80 (1976); *Phipps v. General Motors Corp.,* Md.Ct.App., 278 Md. 337, 363 A.2d 955 (1976); *Markle v. Mulholland's, Inc.,* Or.Supr., 265 Or. 259, 509 P.2d 529 (1973).

In view of the novelty of the issue of preemption, and at the risk of some repetition of the discussion contained in *Martin,* a brief review of the basic concepts and development of the two bodies of law here involved may be helpful.

### A.

The emergence of the doctrine of strict tort liability in the products liability area is generally attributed to Dean Prosser. See Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer),* 69 Yale L.J. 1099 (1960); [hereinafter cited as "Prosser, *The Assault* "] Prosser, *The Fall of the Citadel (Strict Liability to the Consumer)* 50 Minn.L.Rev. 791 (1966) [hereinafter cited as "Prosser, *The Fall* "]. The doctrine was first incorporated into case law by Chief Justice (then Justice) Traynor in 1963 in *Greenman v. Yuba Power Products, Inc.,* Cal.Supr., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963). It was later adopted by the American Law Institute in 1965 as section 402A of the Second Restatement of the Law of Torts.[4] It has since

---

**3.** 353 A.2d at 584, n. 7.

**4.** § 402A states:

"§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

become the prevailing remedy in products liability cases in this country. See *Martin*, 353 A.2d at 584.

Briefly, strict tort liability, as restated in § 402A, was specifically aimed at remedying injuries caused by defective products. It holds manufacturers, distributors and wholesale and retail dealers liable without fault for these injuries. It is not applicable, however, to sellers who do not regularly engage in the business of selling the particular product. Recovery under this doctrine is available to any user or consumer of the product regardless of his contractual status *vis a vis* the individual sellers. Likewise, the injured party's right to recover is not dependent upon the rules and limitations imposed on contractual relationships; i. e. the rules of notice, disclaimer, and the applicable statute of limitations.

The development of this new doctrine of liability was based upon four basic premises:

First, strict liability was deemed to have its theoretical basis in tort, not contract. Prosser, *The Assault, supra* at 1126–1127; Prosser, *The Fall, supra* at 800–802; *Greenman*, 27 Cal.Rptr. at 701, 377 P.2d at 901; Restatement (Second) of Torts, § 402A, Comment m (1965). This is important to the issue before us because the Uniform Sales Act, the predecessor to the Uniform Commercial Code, was seen as dominant in the law of contractual sales.

Second, the concept of strict liability was seen as an extension of the common–law food warranty. The common–law food warranty was an implied warranty imposed by law under which it was presumed that the manufacturer of foodstuffs had vouched for its wholesomeness and fitness for human consumption. See *Handy v. Uniroyal, Inc.*, D.Del., 327 F.Supp. 596 (1971); Titus, *Restatement of Torts Section 402A and the Uniform Commercial Code*, 22 Stan.L.Rev. 713 (1970) [hereinafter cited as "Titus"]. This warranty inured to the benefit of all consumers, without the requirement of privity, since the warranty was seen as running with the goods themselves. Prosser, *The Assault, supra* at 1110; Pros-

ser, *The Fall, supra* at 800; *Greenman*, 27 Cal.Rptr. at 701, 377 P.2d at 901; Restatement (Second) of Torts, § 402A Comment a (1965).

Third, the law of sales warranties was viewed as wholly inadequate to deal with the scope and extent of injuries to an ever–growing consuming public caused by ever–increasing types of products. The sales warranty procedural restraints of privity, notice, disclaimer and applicable statutes of limitations were viewed as "booby–traps" for the unwary consumer and unjustified in the context of the more modern manufacturer–consumer relationship. Prosser, *The Assault, supra* at 1130–1131; *Greenman*, 27 Cal.Rptr. at 700, 377 P.2d at 900.

Finally, the doctrine of strict tort liability was based on the perceived need for greater protection of the consuming public from manufacturers beyond that provided by the contract warranty theory. This was accomplished through the mechanism of "risk shifting" which was very effectively described by Chief Justice Traynor in *Escola v. Coca Cola Bottling Co.*, Cal.Supr., 24 Cal.2d 453, 150 P.2d 436, 441 (1944) as follows:

"Those who suffer injury from defective products are unprepared to meet its consequences. The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business. It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury they may cause upon the manufacturer, who, even if he is not negligent in the manufacture of the product, is responsible for its reaching the market. However intermittently such injuries may occur and however haphazardly they may strike, the risk of their occurrence is a constant

risk and a general one. Against such a risk there should be general and constant protection and the manufacturer is best situated to afford such protection."

## B.

Turning now to the basic concepts and development of the Uniform Commercial Code: they parallel those of the doctrine of strict tort liability. Prior to the adoption of the Uniform Commercial Code, the law of contracts and problems related thereto were controlled by the Uniform Sales Act, enacted in Delaware in 1935 as 6 *Del.C.* § 701 *et seq.*[5] This Act was generally considered to be merely an attempt to codify the common law pertaining to sales contracts. See *Chapman v. Brown,* D. Hawaii, 198 F.Supp. 78, 99 n. 41 (1961); Shanker, *Strict Tort Theory of Products Liability and the Uniform Commercial Code,* 17 Western Reserve L.Rev. 5, 20 (1965) [hereinafter "Shanker"].

The Uniform Commercial Code was initially promulgated and adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws in 1951. Later that year, it was endorsed by the American Bar Association. The Code grew out of the desirability of a more uniform act governing the law of commercial transactions and the recognition that current laws were inadequate to cope with modern business practices. Numerous reviews and revisions have appeared throughout its evolution. Since the initial promulgation of the Code, five revised "Official Texts" have been issued; the first revision in 1957, and later revisions following in 1958, 1962, 1966 and 1972. See *Report No. 1 of the Permanent Editorial Board for the Uniform Commercial Code,* 1 Uniform Laws Annotated XXV (1968).

Incorporated in the Code, and critical to the issue presented here, are the provisions concerned with protecting the buyer and ultimate consumer from the hazards that may be produced by defective products. The implied warranties of merchantability and fitness for a particular purpose, the Code counterparts of the "warranty" found in strict tort liability, are provided in 6 *Del.C.* §§ 2–314(1)[6] and 2–315.[7] These warranties, like the doctrine of strict tort liability, apply only to sellers who deal in goods of the kind in question. See 6 *Del.C.* § 2–104(1).[8] Consequential damages are recoverable for a seller's breach; included as part of such consequential damages is injury to the person, 6 *Del.C.* § 2–715(2)(b),[9] the limitation of which is prima facie uncon-

---

5. Repealed in 1967 upon the enactment of the Uniform Commercial Code in that same year.

6. 6 *Del.C.* §§ 2–314(1) states:
"§ 2–314. Implied warranty; merchantability; usage of trade.
"(1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale."

7. 6 *Del.C.* § 2–315 states in pertinent part:
"§ 2–315. Implied warranty; fitness for particular purpose.
"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

8. 6 *Del.C.* § 2–104(1) states in pertinent part:
"§ 2–104. Definitions: 'merchant'; 'between merchants'; 'financing agency.'
"(1) 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

9. 6 *Del.C.* § 2–715(2)(b) states in pertinent part:
"§ 2–715. Buyer's incidental and consequential damages.
"(2) Consequential damages resulting from the seller's breach include
"(b) *injury to person or property* proximately resulting from any breach of warranty."

scionable when consumer goods are involved, 6 *Del.C.* § 2–719(3).[10]

Unlike strict tort liability, however, the recovery for injuries under the Code is, generally speaking, dependent on whether there is privity between the parties.[11] Recovery of damages may also be affected by the presence of notice of the defect to the seller or manufacturer, 6 *Del.C.* § 2–607(3)(a),[12] the existence of disclaimers, 6 *Del.C.* § 2–316,[13] and the term of the applicable contract statute of limitations, 6 *Del.C.* § 725.[14]

### III.

Thus, we are confronted with two doctrines of independent yet parallel develop-

ment addressed to the protection of the consumer: one of judicial origin, the other legislative. The plaintiffs urge this Court to apply the doctrine of strict tort liability in sales transactions and to concur in the conclusions of most other state courts that the Uniform Commercial Code does not preempt the adoption of the doctrine in such cases.

We conclude that we would be engaging in impermissible judicial legislation to do so under the U.C.C. as adopted in this State.

### A.

Numerous reasons have been advanced to justify the viability of the doctrine of strict

**10.** 6 *Del.C.* § 2–719(3) states:
"§ 2–719. Contractual modification or limitation of remedy.
"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

**11.** As will be discussed hereinafter, 6 *Del.C.* § 2–318 has abolished the privity requirement in Delaware as to natural persons, in the following language:
"§ 2–318. Third party beneficiaries of warranties express or implied.
"A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section."

**12.** 6 *Del.C.* § 2–607(3)(a) states in pertinent part:
"§ 2–607. Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over.
"(3) Where a tender has been accepted
"(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;"

**13.** 6 *Del.C.* § 2–316 states in pertinent part:
"§ 2–316. Exclusion or modification of warranties.
"(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must

be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'
"(3) Notwithstanding subsection (2)
"(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and
"(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and
"(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade."

**14.** 6 *Del.C.* § 2–725 states in pertinent part:
"§ 2–725. Statute of limitations in contracts for sale.
"(1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitations to not less than one year but may not extend it.
"(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

liability in tort in cases involving sales of goods, the U.C.C. notwithstanding. The arguments essentially fall into two categories: (1) that these two bodies of law are conceptually distinct, therefore precluding preemption; and (2) that even though some overlap of theory may occur, the two remedial concepts can coexist, since the U.C.C. explicitly allows judicial development of other remedies outside the confines of the Code.

The arguments proposed to reject preemption on the basis of the distinctiveness of the two bodies of law involved, in the main, parallel those arguments used to justify the emergence of strict tort liability. The most usual argument is that strict liability has its foundation in tort, rather than contract, and therefore the U.C.C. does not preclude its operation. This contention is based on three assumptions: (1) the "warranty" serving as the basis for strict tort liability has its theoretical foundation in tort law; (2) the U.C.C. is purely contractual in nature and therefore purely tortious theories of recovery are outside its pale; and (3) the language of the Official Comments following § 2–318 allows extra–Code development of tort law by the judiciary.[15] E.g., *Caruth v. Mariani*, Ct.App.Ariz., 11 Ariz.App. 188, 463 P.2d 83 (1970); *West v. Caterpillar Tractor Company, Inc.*, Fla. Supr., 336 So.2d 80 (1976); *Markle v. Mulholland's, Inc.*, Or.Supr., 265 Or. 259, 509 P.2d 529 (1973); *Pearson v. Franklin Laboratories, Inc.*, S.D.Supr., 254 N.W.2d 133 (1977); *Dippel v. Sciano*, Wis.Supr., 37 Wis.2d 443, 155 N.W.2d 55 (1967).

The supposition that, in reality, strict liability is based on tort concepts, rather than contract law, originated with Prosser's initial articles concerning the development of the doctrine. Prosser surmised that since the common–law implied warranties that gave rise to strict tort liability had their original basis in tort, strict tort liability

must also have its underpinnings in tort law. Prosser, *The Assault, supra* at 1126–1127; Prosser, *The Fall, supra* at 800–803. The fallacy of this supposition,[16] however, is that although the implied warranties we here consider may have been tortious in nature in the distant past, subsequent developments in the law have inextricably tied them to sales contracts. *Titus, supra* at 728–734. This was recognized by this Court in *Ciociola v. Delaware Coca–Cola Bottling Company*, Del.Supr., 53 Del. 477, 172 A.2d 252, 256 (1961) where it was stated:

> "Liability by a seller or manufacturer of goods for breach of warranty originally was based on tort concepts. Originally the action was always brought as an action on the case for the breach. Gradually, the concept of the nature of the action changed and an action was permitted finally to be brought on the contract itself. Thereafter, rightly or wrongly, actions for breach of an implied warranty were regarded as *ex contractu*. From this concept arose the necessity of some privity being in existence between the suing plaintiff and the implied warrantor. * *.
>
> "This concept of the common law, that an action brought for breach of implied warranty ['sufficient to recover damages irrespective of the fault or negligence of the warrantors'] was an action on a contract, was thus early adopted in Delaware in all of its ramifications including the requirement that there be privity of contract between the plaintiff and defendant."

### B.

■ Nevertheless, even if we were to accept the argument that strict tort liability is based purely in tort, we would be unable to conclude that no preemption has occurred under our version of the U.C.C.

---

15. See Official Comments 2 and 3 to § 2–318 at p. 977 hereof.

16. It has been admitted by some of the staunchest advocates of the strict liability theory that this argument may not be valid. E.g.,

*Wade, Is Section 402A of the Second Restatement of Torts Preempted by the U.C.C. and Therefore Unconstitutional?*, 42 Tenn.L.Rev. 123, 142 (1974) [hereinafter cited as *Wade*].

A finding of no preemption may very well have been a proper conclusion at the time when commercial transactions were governed by the Uniform Sales Act since, as previously noted, that Act was merely a codification of the common law regarding contracts of sale. The U.C.C. on the other hand, is premised on a much broader set of goals. Obviously, the Code's major concern is the establishment of a sales law that could effectively deal with contemporary realities.

> "It had been recognized for years that the Uniform Acts dealing with commercial transactions 'needed substantial revision to keep them in step with modern commercial practices and to integrate each of them with the others.'

> "The concept of the present Act is that 'commercial transactions' is a single subject of the law, notwithstanding its many facets. . . . This Act purports to deal with all phases which may ordinarily arise in the handling of a commercial transaction, from start to finish."

*General Comment of the National Conference of Commissioners on Uniform State Laws and the American Law Institute,* 1 Uniform Laws Annotated XVI, XVII (1968). The U.C.C.'s all inclusive attitude concerning the legal concept of "commercial transaction", and its manifest attempts to provide remedies for personal injury to the consumer, all suggest that a hybridization of tort and contract concepts has occurred by virtue of the provisions of the U.C.C. See *Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective Products Cases,* 18 Stan.L.Rev. 974, 1016 (1966) [hereinafter cited as "Franklin"]; *Shanker, supra* at 36.

The attempts by the proponents of strict tort liability to categorize the law of products liability as strictly in tort or strictly in contract fail to recognize the intertwining of principles from both substantive areas. The recent amendments to § 2–318 of the

U.C.C., addressed to the abolition of privity in sales warranty cases and the treatment of personal injury as consequential damages, relate more to tort concepts than to contract. See *Franklin, supra* at 1016. Moreover, recent decisions in jurisdictions which have embraced strict tort liability have shown a willingness (1) to apply that doctrine to purely economic injury, heretofore considered solely within the province of the Uniform Commercial Code, see e.g. *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.,* 3 Cir., 499 F.2d 146 (1973) (construing Pennsylvania law); *Herbstman v. Eastman Kodak Co.,* N.J.Supr., 68 N.J. 1, 342 A.2d 181 (1975); *Santor v. A & M Karagheusian,* N.J.Supr., 44 N.J. 52, 207 A.2d 305 (1965); *Monsanto Co. v. Alden Leeds, Inc.,* N.J.Super., 130 N.J.Super. 245, 326 A.2d 90 (1974); *Monsanto Co. v. Thrasher,* Tex.Civ.Ct.App., 463 S.W.2d 25 (1970); and (2) to allow contractutal waiver of strict tort liability on the basis of U.C.C. policy, *Keystone Aeronautics Corp. v. R. J. Enstrom Corp., supra; Monsanto Co. v. Alden Leeds, Inc., supra.* See generally, Note, *Economic Losses and Strict Products Liability: A Record of Judicial Confusion Between Contract and Tort,* 54 Notre Dame Lawyer 118 (1978).

Proponents of the tort–contract distinction also contend that the usual Code defenses of privity, notice, disclaimer and the applicable statute of limitations work serious injustices to consumers and do not adequately serve the purposes of the policy underlying either the Code or strict tort liability warranty theories. See *Caruth v. Mariani, supra; Greenman v. Yuba Power Products, Inc., supra; West v. Caterpillar Tractor Company, Inc., supra; Markle v. Mulholland's, Inc., supra; Dippel v. Sciano, supra.*

The answer for us lies in the proposition that the defenses of privity, notice, and disclaimer have, in large measure, become ineffective in consumer product liability cases in this State. In Delaware, privity has largely been abolished. See The Delaware Study Comment to § 2–318.[17] The

---

17. The Delaware Study Comment to § 2–318 states in pertinent part:

"The case law in most of the larger commercial states has resulted in large measure in the

requirement of notice has been greatly liberalized to reflect the differences between commercial buyers and consumers. Official Comments 4 and 5 to § 2–607 state:

"The time of notification is to be determined by applying commercial standards to the merchant buyer. 'A reasonable time' for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy. . . .

"Under this Article various beneficiaries are given rights for injuries sustained by them because of the seller's breach of warranty. Such a beneficiary does not fall within the reason of the present section in regard to discovery of defects and the giving of notice within a reasonable time after acceptance, since he has nothing to do with acceptance. However, the reason of this section does extend to requiring the beneficiary to notify the seller that an injury has occurred. What is said above, with regard to the extended time for reasonable notification from the lay consumer after the injury is also applicable here; but even a beneficiary can be properly held to the use of good faith in notifying, once he has had time to become aware of the legal situation."

1 Uniform Laws Annotated 377 (1968). Similarly, limitation of damages for personal injury to consumers has been declared prima facie unconscionable,[18] 6 *Del.C.* § 2–719(3), and any disclaimers must be made in a conscionable fashion. 6 *Del.C.* § 2–302.

Although these defenses may still work hardship and unfairness in some product liability cases, their continued existence in the face of harsh judicial and academic criticism, addressed to them throughout the years of the development of the doctrine of strict tort liability, suggests a legislative intent that these defenses should continue to exist in sales cases. It is not the function of this Court, however, to reject legislative doctrine on the basis of its wisdom, fairness, appropriateness, or desirability.

### C.

Finally, we are unable to accept the argument of the proponents of the doctrine of strict tort liability that the U.C.C. expressly permits judicial development of an alternate tort theory outside the confines of its own mechanisms. Official Comments 2 and 3 to § 2–318 state in pertinent part:

"The purpose of this section is to give certain beneficiaries the benefit of the same warranty which the buyer received in the contract of sale, thereby freeing any such beneficiaries from any technical rules as to 'privity'. It seeks to accomplish this purpose *without any derogation of any right or remedy resting on negligence.* . . . [T]he section in this form is neutral and is not *intended to enlarge or restrict the developing case law on whether the sellers warranties, given to his buyer who resells, extend to other persons in the distributive chain.*"

1 Uniform Laws Annotated 251 (1968) (emphasis added). Courts have construed this

---

abolition of the privity requirement and the adoption of a rule which is substantially in accord with the version of § 2–318 adopted by Delaware. The Delaware Uniform Commercial Code Committee is of the opinion that the recommended amendment is reasonable, is in accord with modern commentaries, and will bring the Delaware law in substantial conformity with the law of a number of states (including the larger commercial states) which have adopted the Code. The variation in the language of § 2–318 is required to accomplish this purpose because of the decision of the Delaware Supreme Court in *Ciociola v. Delaware Coca Cola Bottling Co.*, 53 Delaware 477, 172

A.2d 252 (1961). In that case the Court held that Delaware was committed to the common law rule governing actions for breach of implied warranties, and that any change would have to be made by the Legislature rather than the Judicial Branch."

**18.** It is currently unclear whether a complete disclaimer of responsibility for personal injury to consumers, made in a conscionable manner, is prohibited by this section. Cf. *McCarty v. E. J. Korvette, Inc.*, Md.Ct.Spec.App., 28 Md.App. 421, 347 A.2d 253 (1975); *Franklin, supra* at 1017.

language as license to move outside the Code and adopt strict tort liability. E.g. *Dippel v. Sciano*, Wis.Supr., 37 Wis.2d 443, 155 N.W.2d 55 (1967).

This argument, however, presents several serious difficulties: First, the development of strict tort liability cannot be harmonized with the commentary language regarding negligence, since the doctrine, by definition, does not rely in any way on negligence.[19] *Restatement (Second) of Torts* § 402A, Comment m. Second, the subsequent "neutrality" language appears merely to extend warranty coverage under the Code, rather than allow creation of a new "warranty" to exist apart from the Code. See *Franklin, supra* at 966, *Shanker, supra* at 27. Finally, even more destructive to the "neutrality" argument is its inapplicability to the Code as adopted in Delaware. When the Code was amended by the American Law Institute in 1966, § 2–318 was altered to offer three alternative privity sections for state adoption. The alternatives offered were:

"Alternative A

"A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

"Alternative B

"A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

"Alternative C

"A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends. As amended 1966."

1 Uniform Laws Annotated § 2–318 (1968). Delaware adopted Alternative B, in a somewhat modified form.[20] *Martin*, 353 A.2d at 583, n. 3. The neutrality language, however, refers to Alternative A and is thus inappropriate here. See 1 Uniform Laws Annotated § 2–318, Comment 3 (1968).

Having rejected the notion that strict tort liability and the sales warranty theory underlying the U.C.C. are completely separate entities, or that the U.C.C. expressly permits extra–Code development of competing theories, we must now determine whether the General Assembly intended to preclude the adoption of the doctrine of strict tort liability and preempt the field of sales via the Code. We conclude that such preemption was intended.

IV.

Legislative history on this subject is sparse, but we find persuasive the information that does exist.

As previously noted, in adopting one of the alternative choices to § 2–318 from the 1966 Official Text of the U.C.C., the Delaware General Assembly chose Alternative B, although in a slightly modified form. This modification made the Delaware version of § 2–318 coextensive with Alternative C, at least with respect to the scope of injuries covered. Official Comment 3 to § 2–318 states that Alternative C was in-

---

**19.** As a corollary to this issue one author has suggested that strict liability be viewed as negligence per se. Wade, *Is Section 402A of the Second Restatement of Torts Preempted by the U.C.C. and Therefore Unconstitutional*, 42 Tenn.L.Rev. 123 (1974). This position has been adopted by some courts. See e.g. *Phipps v. General Motors Corp., supra* 278 Md. 337, 363 A.2d at 962. This argument, however, is similarly objectionable. Negligence per se merely

involves the judicial adoption of a proper mode of conduct. In strict tort liability cases, however, conduct is not relevant since liability is based on the product's defectiveness, rather than some breach of an accepted mode of conduct. Frumer & Friedman, *Products Liability* § 16A[4][i].

**20.** See text at p. 974 hereof.

tended to follow "the trend of modern decisions as indicated by Restatement of Torts 2d § 402A * * * in extending the rule beyond injuries to the person." 1 Uniform Laws Annotated 251 (1968).

This development is further underscored by the Delaware Code Comment following § 2–318, stating that our version of § 2–318, abrogating the requirement of privity, was made in response to *Ciociola* in which this Court held that Delaware was committed to the common law rule governing actions for breach of implied warranties and rejected the then–emerging doctrine of strict tort liability, stating: "It may well be desirable as a matter of public policy to impose absolute liability upon a manufacturer for injuries caused by defects in his product but, if such is to be the public policy of this State, it must be made so by the Legislative rather than the Judicial Branch of the Government, the function of which is not to change established law but to apply it." 172 A.2d at 257. The General Assembly's choice to make the Code nearly coextensive with the coverage under § 402A, at least with respect to privity and the scope of injury, suggests clearly, we think, that it intended that products liability remedies in sales cases be treated within the confines of sales warranty law and that there be no remedy therefor outside the Code.

It is this legislative response to *Ciociola* that differentiates Delaware from those other jurisdictions that have specifically found no preemption. See *Caruth v. Mariani, supra; Larson v. Clark Equipment Co., supra; West v. Caterpillar Tractor Company, Inc., supra; Phipps v. General Motors Corp., supra; Markle v. Mulholland's, Inc., supra.* In most of these cases, the strict tort liability doctrine had been in existence for some time prior to the first mention of the preemption issue, or at least had not been explicitly rejected; thus legislative inaction could be seen as tacit approval for the doctrine's development. In the instant case, however, the rejection by *Ciociola* of the strict tort liability theory in 1961 and the Legislature's subsequent adoption of the U.C.C. in 1967, with the abrogation of the rules of privity governing actions in contract but retaining the defenses of disclaimer, notice, and the contract statute of limitation, can in no way be viewed as tacit approval of the case law then developing the doctrine of strict tort liability. On the contrary, it suggests to our satisfaction that the Code was intended by the General Assembly to be the sole remedy beyond negligence in products liability cases involving sales transactions.

Finally, if additional persuasive reasons were needed to support the conclusion we reach here, there is the proposition that because of the similarity of coverage of the two remedial doctrines, the judicial adoption of the doctrine of strict tort liability causes the demise of the legislative U.C.C. provisions regarding injury to consumers caused by the sale of defective products. See Littlefield, *Some Thoughts on Products Liability Law: A Reply to Professor Shanker*, 18 Western Reserve L.Rev. 10, 19 (1966), [hereinafter cited as "Littlefield"]. *Shanker, supra* at 10–11. *Titus, supra* at 755. Manifestly, the adoption of the doctrine of strict tort liability in sales cases would directly displace the implied warranty provisions of the U.C.C. Plaintiffs would rarely be inclined to use the U.C.C. remedy with its concommitant defenses, preferring of course to seek the remedy of strict tort liability without the obstacles of such defenses. Prosser recognized the great similarity in the two theories when he stated:

"It would be easy, however, to overestimate the significance of the change, which is more one of theory than of substance. It is only the rules of contract which have been jettisoned, where there is no contract. The substance of the sellers undertaking remains unaffected; and as Chief Justice Traynor himself has agreed, the precedents of the 'warranty' cases will still determine what he must deliver. They will determine also the extent of his liability, except in so far as limitations derived from the law of contract have been applied. No case has been overthrown unless it has applied such a contract limitation."

Prosser, *The Fall, supra* at 804–805 (footnotes omitted).

It has been stated that no matter what choice is made, one theory will be eclipsed; that, therefore, the decision should be made on the basis of the "appropriateness" of the relevant theories and remedies. *Littefield, supra* at 20. This argument begs the question; the issue in this case, as previously pointed out, is not one of the "appropriateness" (i. e., fairness) of the Code remedies for the determination of liability in sales cases, but rather the propriety of the adoption by this Court of a judicial doctrine in clear competition, even to the point of eclipse, with a legislative mandate.

In view of (1) the destructive effect that the adoption of the strict tort liability doctrine would have on the Code remedies available to the consumer in sales transactions; (2) the clear intent of the General Assembly to treat consumer injuries by defective products through the medium of sales warranty law; and (3) the lack of adequate justification for the separate existence of a tort remedy apart from the Code in sales transactions, we conclude that the General Assembly did not intend to permit the adoption of a competing theory of liability in cases involving the sales of goods and, thus, preempted the field.

Accordingly, we conclude that it is not within the power of this Court to adopt the doctrine of strict tort liability in sales cases due to the preeminence of the Uniform Commercial Code in the sales field of the law. If more fair and complete protective relief is to be forthcoming for consumers injured by defective products they have purchased, it must come from the General Assembly.[21]

\*　　\*　　\*

Our decision here today is not intended to and does not affect the decision of this Court in *Martin v. Ryder Truck Rental, Inc., supra.* As previously noted, the U.C.C. makes no reference to a bailment–lease, the subject of *Martin.* Thus there, unlike here, this Court was "free, in the common–law tradition" to adopt that which in our view was the most "appropriate" remedy. 353 A.2d at 584, 587.

### V.

■ The plaintiffs contend that choice of law principles require that this case be governed by the law of Maryland, where Prowler is incorporated, or by the law of Ohio or Indiana, where Motor Wheel is incorporated and does business, respectively. Each of these states applies the doctrine of strict tort liability to sales of goods. *Ayr-Way Stores, Inc. v. Chitwood,* Ind.Supr., 261 Ind. 86, 300 N.E.2d 335 (1973); *Phipps v. General Motors Corp.,* Md.Ct.App., 278 Md. 337, 363 A.2d 955 (1976); *Temple v. Wean United Inc.,* Ohio Supr., 50 Ohio 2d 317, 364 N.E.2d 267 (1977). The issue of choice of law was not raised below, however, and may not be considered for the first time here. Supreme Court Rule 8.

### VI.

■ The plaintiffs also argue that the motion for judgment n. o. v. should have been granted because the jury was not instructed on the doctrine of *res ipsa loquitur.* The Trial Court concluded that the charge was inapplicable since the circumstances of injury were as consistent with the absence of defendants' negligence as with its existence. See *General Motors Corporation v. Dillon,* Del.Supr., 367 A.2d 1020, 1023 (1976). We agree. Thus, we find no error in the Trial Judge's refusal to instruct the jury on the doctrine of *res ipsa loquitur.*

### VII.

The plaintiff's remaining contentions center on the Trial Judge's denial of their

---

**21.** Several legislative models exist for the enactment of strict liability by legislative fiat. See, e. g., Ark.Stat.Ann. § 85–2–318.2, 85–2–318.3 (1973); Ga.Code Ann. § 105–106 (1968); Me.Rev.Stat. tit. 14, § 221 (1973); S.C.Code § 66–371 *et seq.* (1974).

Compare this Court's approach to the much-criticized Automobile Guest Statute:

"If, as many believe, the Delaware Automobile Guest Statute leads so often to unreasonable and unjust results and should be repealed forthwith, let its evils stand revealed to the General Assembly without further judicial effort to avoid a bad law by patchwork exceptions." *Justice v. Gatchell,* Del.Supr., 325 A.2d 97, 104 (1974).

alternative motion for a new trial. The defendants contend that these remaining issues should be dismissed summarily. They rely principally on *Trowell v. Diamond Supply Co.*, Del.Supr., 8 Terry 422, 91 A.2d 797, 802 (1952), and *Bellanca Corporation v. Bellanca*, Del.Supr., 3 Storey 56, 164 A.2d 589 (1960).

In *Trowell* it was held that a notice of appeal specifying the order appealed from was ineffective to bring up for review any other judgment or order. Because the order appealed from was one that denied a motion for new trial, which was reviewable only for abuse of discretion, and no abuse of discretion was charged, the appeal was dismissed. In *Bellanca* this Court further concluded that when the order appealed from is an order denying a motion for judgment n. o. v. or new trial, and no charge of abuse of discretion is made, the appeal is limited to those portions of the motion that actually attack the judgment itself.

■ The defendants contend in the instant case that since the plaintiffs nowhere charge an abuse of discretion by the Trial Judge, the appeal from the denial of a new trial should be dismissed. We disagree. First, this case is distinguishable from the *Bellanca* case since there the Court was unsure whether the issues raised on appeal included the denial of the alternative motion for a new trial. 164 A.2d at 590. Second, this Court has recognized that the mere absence of the phrase "abuse of discretion" from the briefs and arguments of the appellant does not always mandate a dismissal of the appeal as to those issues. *Pitts v. White*, Del.Supr., 10 Terry 78, 109 A.2d 786 (1954).

This is not a situation in which the order appealed from and the issues on appeal are in disagreement. Cf. *Trowell v. Diamond Supply Co., supra.* Here plaintiffs are plainly asserting error in the denial of the motion for a new trial and, although there is no specific allegation of "abuse of discretion" by the Trial Judge, we think the allegations made are sufficient to raise that issue. *Pitts v. White, supra.*

Therefore, the appeal from the denial of the motion for new trial shall not be dismissed. This appellate review shall be limited, however, to a determination of whether the Trial Judge's action in denying the motion was arbitrary, capricious or unreasonable. *Szewczyk v. Doubet*, Del.Supr., 354 A.2d 426 (1976); *Bennet v. Andree*, Del.Supr., 252 A.2d 100 (1969).

A.

The plaintiffs first contend that the Trial Judge permitted forged documents to be entered into evidence to their great prejudice. The document in question is purported to be a photocopy of the ignition instructions for the propane heater here involved. The instructions, which were riveted to the casing of the plaintiffs' heater, were destroyed in the explosion. Plaintiffs argue that the serial number on the instruction plate admitted in evidence, which identified the type of heater involved, was altered to make it identical to the serial number known to be on plaintiffs' heater. They contend that this was highly prejudicial since these instructions were contrary to the plaintiff's actions in lighting the heater, thus clearly suggesting contributory negligence.

■ While it is clear that some re–marking of the last digit of the serial number appears on the photocopy, it is not clear from the record whether the last digit was modified or merely made more legible. We are unable to find that the action of the Trial Judge in dismissing this as a ground for a new trial was an abuse of discretion. As the Trial Judge noted, and the record confirms, the jury found that defendants were not negligent in the design, construction or manufacture of the trailer or heater. Thus, the issue of contributory negligence did not arise before the jury. It follows that the admission of the evidence in question could not have prejudiced the plaintiffs' case.

B.

■ The plaintiffs also assign error to the Trial Judge's refusal to allow plaintiffs'

counsel, on redirect examination of plaintiff Roy Cline, to delve into the reasons the plaintiff bought another Prowler trailer with an identical heater and whether he made any safety adjustments. The plaintiffs assert this caused undue prejudice since it indicated to the jury that the plaintiffs did not believe the trailer to be dangerous or defective.

The record shows, however, that the plaintiff was permitted to answer the first of these questions. His answer indicated that all the trailers within the price range that he could afford had this type of heater; thus there was little choice in the matter. The Trial Judge refused, however, to allow the second question to be asked on the grounds that subsequent modifications were irrelevant.

We conclude that the plaintiff's answer to the question of why he bought a nearly identical trailer was sufficient to explain away whatever negative inference the jury may have perceived from the subsequent purchase. Therefore, we find no abuse of discretion by the Trial Judge in this connection.

### C.

■ The plaintiffs finally argue in this connection that a new trial should be granted because Motor Wheel deliberately avoided the disclosure of material evidence and the names of critical expert witnesses until immediately before trial. The plaintiffs' allegations center around certain interrogatories posed during the discovery phase of the case in which plaintiffs inquired into design specifications of the heater in question, the existence and results of laboratory tests on the heater, and the names of experts to be used to attest to this information. The plaintiffs contend that answers to these interrogatories were deliberately denied to them until shortly before trial and prejudiced their case, since they were forced to prove defects in design and construction of the heater without adequate information.

At trial, upon objection by the plaintiffs' counsel, the testimony of one of the expert witnesses of Motor Wheel, concerning certain tests conducted on the heater, was excluded. In the opinion denying the motion for new trial, the Trial Court noted that no other sanctions were requested by the plaintiffs and concluded that plaintiffs could not seek post–trial relief on issues that were subject to resolution at trial.

The plaintiffs argue essentially that four mitigating circumstances require a new trial: (1) Motor Wheel's key expert, Peter Bodett, was not identified until the eve of trial; (2) Motor Wheel did not disclose the existence of post–injury tests made on a similar heater; (3) Bodett's testimony was totally based on his association with the heater during the undisclosed testing; and (4) Motor Wheel's failure to disclose blue print designs prevented plaintiffs from proving design defects. The plaintiffs do not establish abuse of discretion on any of these grounds.

Contrary to the plaintiffs' assertions, expert Bodett had been identified in the answers to plaintiffs' interrogatories long before the eve of trial. Indeed, over a year before trial, Bodett had been identified as a person familiar with the design and testing of the heater in question. The plaintiffs had more than ample opportunity to depose this witness and cannot place blame on Motor Wheel for their failure to do so.

The plaintiffs' second contention is similarly unavailing. While Motor Wheel's failure to notify the plaintiffs of the existence of the post–explosion tests might have been prejudicial had the evidence been admitted, here the Trial Judge excluded the evidence in question. Thus, we can discern no error sufficient to mandate a new trial.

Finally, we are unable to find any error amounting to an abuse of discretion in the failure of the Trial Judge to grant a new trial on the basis of the plaintiffs' last two contentions. The plaintiffs failed to object to the admission of the testimony of expert Bodett or to testimony concerning the design of the heater. As previously stated, the plaintiffs' only objections specifically concerned the admissibility of testimony re-

garding the procedures and results of the undisclosed test and the qualifications of expert Bodett as an expert. No other objection was made regarding the testimony of either of Motor Wheel's experts. Moreover, at trial Motor Wheel offered to move for a mistrial and to pay for plaintiffs' costs to that point in conducting the trial in order to allow the plaintiffs time to scrutinize the newly disclosed evidence. The plaintiffs rejected the offer. We can only conclude that plaintiffs made a tactical choice to continue in spite of this perceived disadvantage. As the Trial Judge noted, plaintiffs cannot now be heard to complain.

The plaintiffs rely on *Concord Towers, Inc. v. Long*, Del.Supr., 348 A.2d 325 (1975) in this connection. There it was held error to allow into evidence testimony that should have been disclosed in answer to plaintiffs' interrogatories, despite the plaintiffs' refusal to accept the Trial Court's offer to order a continuance. The instant case, however, is distinguishable from *Concord Towers*. There, the complaining party objected to all the undisclosed evidence. Here, only a selected portion of the testimony was objected to. Moreover, in *Concord Towers* the remedy offered to the plaintiff was merely a continuance in the case. As this Court noted, the prejudice incurred in the first instance in *Concord Towers* continued to linger with the jury. Here, however, the plaintiffs were offered a complete new trial, including a new jury, and the payment of their litigation expenses to that point.

\* \* \*

We conclude, therefore, that no abuse of discretion was incurred by the action of the Trial Court in denying the plaintiffs' alternative motion for a new trial.

## VIII.

In its appeal, Prowler cites error in the grant by the Trial Judge of attorneys fees and expenses to defendant Horsey under Superior Court Rule 37(c).

Prior to trial, Horsey served a request for admissions on all parties in the case. The admissions requested were as follows:

"1. Robert G. Horsey t/a Parkview Trailer Sales ('Horsey') had no contact nor involvement with the manufacture, construction, and/or design of the trailer in which the plaintiff was allegedly injured on or about October 8, 1974 (the 'trailer').

"2. Horsey had no contact nor involvement with the construction, manufacture and/or design of any of the components of the trailer.

"3. Horsey's involvement with this trailer was limited to washing it, selling it to the plaintiffs, and turning on the components."

To those requests for admission, Prowler filed the following answers:

"1. Denied.

"2. Denied.

"3. This matter is within the personal knowledge of the requesting party and is not within the personal knowledge of the responding party. Therefore, this responding party need not reply."

At trial, Horsey requested a directed verdict in his favor at the end of the presentation of the plaintiffs' evidence. Upon objection by Prowler, this motion was denied. At the close of all the evidence, however, Horsey renewed his motion for directed verdict, which was then granted without objection. Subsequently, Horsey petitioned the Trial Court for attorneys fees and expenses pursuant to Superior Court Rule 37(c). This motion was granted; the Court awarded a judgment in favor of Horsey against Prowler in the amount of $4,363.00.

Superior Court Rule 37(c) requires that reasonable expenses be awarded to a party litigant when an opposing party refuses or fails to admit the truth of a requested admission and that requested admission is later proved to be true. A party is not relieved from paying the moving party's expenses unless: (1) the request was held objectionable under Superior Court Rule 36(a); [22] (2) the admission sought was

22. Superior Court Rule 36(a) provides:
   "(a) Request for Admission: A party may serve upon any other party a written request

for the admission, for purposes of the pending action only, of the truth of any matters within the scope of Rule 26(b) set forth in the request

of no substantial importance; (3) the party failing to admit had reasonable grounds to believe that it might prevail on the matter; and (4) there was other good reason for failure to admit. Since awards under the Rule are made in the discretion of the Court, they are subject to reversal only if an abuse of that discretion is found. See *Wileman v. Signal Finance Corp.*, Del.Supr., 385 A.2d 689 (1978).

■ Prowler first contends that because of the use of the word "contact," the request for admissions was broad and inartfully drawn. In addition, it claims that because of this breadth the denial was proper, since "contact" could be construed as equal to knowledge of the design, construction and manufacture of the heater, which defendant Horsey possessed. Essentially, this argument questions the scope of the request for admission and is unavailing here. The place for such contention is prior to trial pursuant to Superior Court Rule 36(a), not subsequent to trial in an effort to resist a motion for expenses under Rule

37(c). Superior Court Rule 37(c)(1); see 8 Wright & Miller, *Federal Practice and Procedure*, § 2290, p. 804 (1970).

Prowler contends under Rule 37(c)(2) that the admission sought was of no substantial importance. This, however, is clearly not the case, since, as the Trial Judge concluded, the admission dealt with the substance of the relationship between Horsey and the plaintiffs and between the defendants themselves.

■ Prowler also argues, under Rules 37(c)(3) or (4), that because of certain exclusions and disclaimers made by Prowler in its warranty, Horsey could have been found liable to plaintiffs and thus the failure to admit was justified. Whether this might be a justifiable position, we cannot say, since the record is inadequate on this issue. Prowler has the burden of persuasion on this issue and the mere mention of a possible defense, without more, is insufficient to meet this burden. *Wileman v. Signal Finance Corp., supra.*

that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request. Copies of documents shall be served with the request unless they have been or are otherwise furnished or made available for inspection and copying. The request may, without leave of court, be served upon the plaintiff after commencement of the action and upon any other party with or after service of the summons and complaint upon that party.

"Each matter of which an admission is requested shall be separately set forth. The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the Court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by his attorney, but, unless the Court shortens the time, a defendant shall not be required to serve answers or objections before the expiration of 45 days after service of the summons and complaint upon him. If objection is made, the reasons therefor shall be stated. The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify his answer or deny only a part of the matter

of which an admission is requested, he shall specify so much of it as is true and qualify or deny the remainder. An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless he states that he has made reasonable inquiry and that the information known or readily obtainable by him is insufficient to enable him to admit or deny. A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request; he may, subject to the provisions of Rule 37(c), deny the matter or set forth reasons why he cannot admit or deny it.

"The party who has requested the admissions may move to determine the sufficiency of the answers or objections. Unless the Court determines that an objection is justified, it shall order that an answer be served. If the Court determines that an answer does not comply with the requirements of this Rule, it may order either than the matter is admitted or that an amended answer be served. The Court may, in lieu of these orders, determine that final disposition of the request be made at a pretrial conference or at a designated time prior to trial. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion."

It is further contended that there was no proof by Horsey regarding the extent or degree of Prowler's responsibility for the costs of proving the facts that it failed to admit. We agree. While we concur in the decision of the Trial Court below that Prowler was responsible for Horsey's presence at the entire trial, we cannot agree that it was totally responsible.

 Rule 37(c) requires that a party who unjustifiably fails to admit the truth of a matter requested pay the petitioning party "the reasonable expenses incurred in making that proof". We construe "reasonable" to mean that not only are the number of hours, cost per hour, and other expenses charged reasonable in amount, but that the total amount assessed against a party bear a relationship to his responsibility in causing that party to prove the fact in question. In the case at hand, Prowler was not the only party who failed to admit the requests. While the plaintiffs' answers clearly admitted that Horsey did not design, construct or build the trailer or heater in question, their answer was qualified in such a way as to continue to charge him with negligence.[23] Thus, at least until the end of the plaintiffs' case, the plaintiffs were partially responsible for defendant Horsey's presence at trial.

In any event, Prowler contends that Horsey should have moved for summary judgment in order to mitigate his damages. We reject this argument. This Court, for the purposes of a motion under Rule 37(c), will not second-guess the trial tactics adopted by a party, unless the record clearly shows that the action was undertaken solely to enlarge the amount of expenses or otherwise to harass. Horsey's presence at trial was, in part, at least, the responsibility of Prowler and it cannot now be heard to complain about the trial tactics it used in its defense.

In the light of the Trial Court's failure to consider the foregoing, we conclude that the award of the whole $4,363 against Prowler was an abuse of discretion. Consequently, this issue must be remanded to the Superior Court for a hearing to determine the extent or degree of Prowler's responsibility for the expenses and fees incurred. Since Prowler has stipulated to the reasonableness of the expenses and fees incurred by Horsey, that issue need not be considered on remand. The extent of Prowler's responsibility for Horsey's fees and expenses, and its relationship to the $4,363 award, are the sole questions remanded for determination.

Affirmed in part; reversed in part and remanded.

---

**23.** Plaintiffs' answer is not completely clear as to the legal basis for the negligence charge, but it appears to be concerned with a charge of a failure to warn.